**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Arturo RODRIGUEZ, Vincente Ramirez,**
**Defendants-Appellants.**

No. 84–5178.

United States Court of Appeals,
Eleventh Circuit.

July 23, 1985.

Marc Cooper, Greene & Cooper, P.A., Miami, Fla., for A. Rodriguez.

Howard Sohn, Sharon L. Wolfe, Miami, Fla., for V. Ramirez.

Stanley Marcus, U.S. Atty., Leonard F. Baer, Jon May, Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before VANCE and ANDERSON, Circuit Judges, and HENLEY *, Senior Circuit Judge.

HENLEY, Senior Circuit Judge:

Arturo Rodriguez and Vincente Ramirez were both charged with conspiracy to distribute cocaine, two counts of assaulting federal officers, theft of government property, and use of a firearm in the commission of a felony. Rodriguez was convicted

* Honorable J. Smith Henley, U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

on the conspiracy count and acquitted of the substantive charges. Ramirez was convicted on the two assault counts and the theft count but acquitted of conspiracy and of using a firearm in the commission of a felony. Both appellants raise a variety of issues on appeal. Rodriguez challenges the sufficiency of the evidence and contends that prejudicial variance between the indictment and the evidence at trial deprived him of a fair trial. He also alleges the district court[1] committed reversible error by failing to be available to answer a question from the jury, and that it erred in considering hearsay before imposing sentence. Ramirez contends that certain discovery violations by the government resulted in an unfair trial. In addition he argues that both the prosecutor and the district court made prejudicial remarks to the jury and challenges the admission into evidence of two handguns and a silencer. We affirm the convictions.

## I. BACKGROUND.

The investigation of appellants began in August of 1983 when Jose Rios, an informant for the Drug Enforcement Administration (DEA), telephoned Rodriguez from Puerto Rico in an attempt to set up a cocaine transaction.[2] As a result of this and subsequent telephone conversations, Rodriguez agreed to find a supplier of cocaine for Rios in Miami. Shortly thereafter, Rios and DEA Agent Felix Jimenez traveled from Puerto Rico to Miami to close the deal.

Jimenez and Rios arrived in Miami on August 23, 1983, checked into a hotel, and met with Rodriguez. Rodriguez was shown about $60,000.00 to be used to purchase the drugs. Rios and Rodriguez then left the hotel to look for Rodriguez's supplier. They first went to see an individual named Felipe who told them that Octavio was out looking for three kilograms of

cocaine. Rios and Rodriguez then left Felipe's apartment and went to see an individual named Tello. While at Tello's apartment, they met Rodolfo, "the Peruvian." Rodriguez told Rios that Rodolfo was a good friend of his and that Rodolfo moved a lot of "material."

Rodolfo agreed to sell them one kilogram of cocaine, and after that was paid for he would sell them two kilograms more. Rios explained that the exchange would have to be postponed until after he had spoken with his brother-in-law, Jimenez, since he was in possession of the money.[3] Rios told Rodolfo he would contact him (Rodolfo) through Rodriguez the next morning.

Soon after Rodolfo left, Octavio arrived with a quantity of cocaine. Rios told Octavio that a deal had already been arranged with Rodolfo but that perhaps they could do business another time. Rios and Rodriguez then returned to the hotel with the understanding that the deal would go through the next day.

The next morning Rodriguez called Rios and told him to get ready to close the deal and that he had found another source for the cocaine. Rodriguez subsequently arrived at the hotel and stated that the deal was set for later that morning. Rodriguez was to receive a $6,000.00 commission for arranging the transaction. He told Jimenez to put $87,000.00 in a paper bag and to wrap his commission separately in toilet paper.

After further discussion, Rios and Rodriguez left to pick up the cocaine and bring it back to the hotel so that Jimenez could inspect it. The two drove to Felipe's apartment where they met a different Octavio, later identified as actually being Rafael Morla. Appellant Ramirez, Felipe, and an unidentified individual were also present. Rodriguez told Rios that these individuals

---

1. The Honorable Norman C. Roettger, United States District Judge, Southern District of Florida.

2. This call was recorded. During the conversation Rodriguez put Rios on hold and called one Octavio. Octavio told Rodriguez he had quantities of cocaine for sale.

3. Apparently, Jimenez could not arrange proper surveillance from other agents that night and had told Rios to postpone the actual exchange until the next day.

owned the cocaine. Ramirez showed Rios three bags containing white powder and told him to test it. Rios declined, stating that he trusted them. Ramirez offered his car to use to go back to the hotel to make the exchange. Ramirez, Rodriguez, Rios and Morla then walked to a black Buick, ostensibly placed the cocaine in the trunk, and drove to the hotel.

When they arrived at the hotel, both Ramirez and Morla wanted to go up to the hotel room to see the money. Rios protested this but eventually agreed to take one of them, Morla, while Ramirez and Rodriguez waited near the car.

Morla and Rios then went to Jimenez's room. Morla used the bathroom, came out and began to count the money. After being assured that the briefcase contained $100,000.00, Morla began to search the room. While he was searching, Jimenez slipped the briefcase under the bed. Morla then suddenly pulled out a pistol, flashed a badge, and told Rios and Jimenez they were under arrest. Morla handcuffed their right hands together and used a coat hanger to tie their left hands. Jimenez told Morla where the money was after Morla threatened to kill him. Morla then gagged Rios and Jimenez with towels and searched and emptied their pockets. When he tried to place a mattress over them, Rios stated that Morla was going to kill them. Jimenez begged for his life but Morla demanded to know where the rest of the money was. Jimenez indicated there was no more and Morla again looked around the room. At that moment, Jimenez somehow partially freed himself, grabbed a gun hidden under a pillow, and fired at Morla. Morla then ran out of the room.

By the time other DEA agents began to move in, Morla had made it to the car and he and Ramirez attempted to drive away. The agents shot at the car's radiator and engine block, however, disabling it. Morla was shot and killed when he got out of the car and began shooting at the officers. Ramirez ran from the car, allegedly firing shots at the agents with a pistol. Both Ramirez, who was wounded in the gun battle, and Rodriguez were subsequently apprehended not far from the scene of the

shooting. The weapon allegedly fired by Ramirez was never found. In addition, no cocaine was found in the trunk of the automobile although two handguns, a silencer, and handcuffs were found hidden in the dashboard.

As stated, the jury convicted Rodriguez of one count of conspiracy to distribute cocaine and convicted Ramirez of two counts of assaulting a federal officer and one count of theft of government property. Rodriguez was sentenced to thirteen years imprisonment while Ramirez received consecutive sentences of ten, ten and seven years imprisonment, for a total of twenty-seven years.

## II. DISCUSSION.

### A. Rodriguez

*Sufficiency of the Evidence.*

Rodriguez contends that the evidence is insufficient to sustain his conspiracy conviction. He contends the evidence only shows he conspired with Rios, Jimenez and Ramirez to distribute cocaine. He argues that since Rios and Jimenez were government agents incapable of conspiracy, and because Ramirez was acquitted, there was no one with which he could have conspired.

We begin by stating the general rules which govern our analysis.

[T]he standard of review is whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." In prosecutions for conspiracy to distribute narcotics under 21 U.S.C. § 846, the essential element is an agreement by two or more persons to violate the drug laws. The existence of such an agreement may be proved by either direct or circumstantial evidence, including "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." A defendant may be found guilty of conspiracy if the evidence demonstrates that he knew the essential objective of the conspiracy, even if he did not know all its details or played only a minor role in the overall scheme.

*United States v. Walker,* 720 F.2d 1527, 1538 (11th Cir.1983) (citations omitted), *cert. denied,* —— U.S. ——, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984).

■ The government acknowledges that Rios and Jimenez cannot be considered parties to the illegal agreement since government agents and informers cannot be conspirators. *See United States v. Elledge,* 723 F.2d 864, 866 (11th Cir.1984). The government also does not rely on Ramirez as a conspirator since he was acquitted. *See United States v. Pearson,* 667 F.2d 12, 13 (5th Cir. Unit B 1982) (per curiam) (where all alleged conspirators are tried jointly and all but one are found not guilty, the remaining conviction may not stand, for one cannot conspire with himself); *United States v. Espinosa-Cerpa,* 630 F.2d 328, 330–33 (5th Cir.1980). *Accord United States v. Albert,* 675 F.2d 712, 713 (5th Cir.1982); *United States v. Sheikh,* 654 F.2d 1057, 1062 (5th Cir. Unit A 1981), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982).

■ Nevertheless, "a defendant may be convicted of conspiring with persons whose names are unknown or who have not been tried and acquitted, if the indictment asserts that such other persons exist, and the evidence supports their existence and the existence of a conspiracy." *Sheikh,* 654 F.2d at 1062; *see United States v. Mulherin,* 710 F.2d 731, 737 (11th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1305, 79 L.Ed.2d 703 (1984). The government asserts that there are at least three other people with whom Rodriguez conspired, namely, Rodolfo, Felipe and the first Octavio. We need not decide if Felipe and Octavio were conspirators, for it is clear Rodolfo conspired to distribute cocaine, and the addition of one other conspirator is all

that is needed to sustain a finding of an illegal agreement.

■ Rodriguez's role in the scheme was as a middleman or broker. He was to put Rios into contact with a source for the drugs. Rodolfo was clearly one of those sources. Notwithstanding Rodriguez's assertions that a firm deal was not made between Rios and Rodolfo on the evening of August 23, 1983, we believe the evidence is sufficient to allow a jury to find that Rios and Rodolfo had agreed to a cocaine transaction even though the actual exchange was not to take place until the next morning. Rios apparently was convinced a deal had been made as he turned down Octavio's offer to sell cocaine after Rodolfo left. Rodolfo departed with a similar understanding that the exchange would take place after Rios spoke to Jimenez. It matters not that all details had not been decided upon, *Elledge,* 723 F.2d at 868 ("A complete detailed agreement is not necessary to convict persons of conspiracy."); *United States v. Badolato,* 701 F.2d 915, 920 (11th Cir.1983),[4] or that the deal with Rodolfo eventually went unconsummated. *United States v. Cuni,* 689 F.2d 1353, 1356 (11th Cir.1982) (per curiam). The evidence is sufficient if a reasonable trier of fact could find that two or more persons were parties to an illegal agreement, here the distribution of cocaine, and that the defendant knowingly and voluntarily assisted in that endeavor. *E.g., United States v. Lippner,* 676 F.2d 456, 466 (11th Cir.1982). Rodolfo's participation and agreement to provide a source for the cocaine established the presence of a second conspirator and quite clearly Rodriguez knowingly aided in the scheme.[5] That is all that is required to

---

4. Details of drug transactions are often left unresolved until the actual exchange of the drugs. *Bandolato,* 701 F.2d at 920. We note that the price, $29,000.00 per kilogram, and the quantity, one kilogram initially with two more kilograms to follow, do appear to have been agreed upon. We believe the jury could have found the existence of an agreement to distribute cocaine, despite the fact that the exact time of delivery was left to be decided.

5. The cases cited by Rodriguez are distinguishable. In both *United States v. White,* 569 F.2d 263 (5th Cir.), *cert. denied,* 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978), and *United States v. Pena,* 527 F.2d 1356 (5th Cir.), *cert. denied,* 426 U.S. 949, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976), the government was unable to show that anyone other than a government agent or informer was a party to the illegal agreement charged in the indictment. Here, Rodolfo fills this evidentiary void.

sustain the jury's verdict in these circumstances.

### Variance.

Rodriguez also contends that prejudicial variance occurred between the indictment and the evidence. He asserts that the indictment charged a conspiracy to distribute cocaine while the evidence, as reflected in the jury's verdict, shows two separate conspiracies, a conspiracy to rob the federal agents involving Ramirez and Morla, and a drug conspiracy involving Rodriguez and the "tangential" characters, Rodolfo, Felipe and Octavio.

█ The simple answer to this is that Rodriguez has shown no prejudice. Assuming arguendo that variance occurred, such is not fatal to the conviction unless it affects the substantial rights of the defendant. *E.g., Berger v. United States,* 295 U.S. 78, 81–82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935); *United States v. Ard,* 731 F.2d 718, 725 (11th Cir.1984). This is not a situation where there was a large number of conspiracies and defendants. *See United States v. Sutherland,* 656 F.2d 1181, 1195–96 (5th Cir. Unit A 1981) *cert. denied,* 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982). *Cf. Kotteakos v. United States,* 328 U.S. 750, 766, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946) (prejudice shown where one conspiracy charged but eight separate ones proven). At most, only two conspiracies were proven involving only two charged defendants. More fundamentally, there clearly was no "transference of guilt" from one defendant to the other. This is shown by the fact that Rodriguez was acquitted on the substantive charges. It therefore affirmatively appears that the jury was able to compartmentalize the evidence and treat each appellant individually. There was no "spillover" effect. *United States v. Solomon,* 686 F.2d 863, 871 (11th Cir.1982). Rodriguez was fairly notified of the charges against him and the indictment was not so imprecise as to prevent him from pleading double jeopardy to a second prosecution. *See id.; United States v. Gonzalez,* 661 F.2d 488, 492 (5th Cir. Unit B 1981).

### The Question from the Jury.

Rodriguez next asserts that the trial judge's failure to answer a question from the jury deprived him of a fair trial. The jury began deliberating at about 10:30 a.m. on January 12, 1984. At the end of the day, the judge announced that he had a prior commitment for a sentencing hearing in Key West scheduled for the next day. Counsel agreed that any questions from the jury could be answered by telephone conference call and that if the jury reached a verdict prior to the judge's return, it would be sealed until he arrived.

At about 10:30 a.m. the next day, the jury sent out the following question:

On Count I, the defendants charged with having conspired to do so [sic]. Does this imply that they conspired to do something in regard to cocaine or did they conspire to do something unlawful?

The judge's law clerk attempted to contact the judge but was unable to reach him immediately. The jury continued to deliberate and reached a verdict between 11:00 a.m. and 11:30 a.m., which was sealed. The judge returned the call between 11:30 a.m. and 12:00 noon, but did not answer the jury's question. Because his flight from Key West was delayed, the judge did not arrive at the courthouse until about 4:00 p.m. A brief conference in chambers was held where the court denied Rodriguez's request to see the question, declined to answer it, and ordered the jury's verdict to be published.

█ A trial judge has some obligation to make reasonable efforts to answer a question from the jury. *Bollenbach v. United States,* 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946). "When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." *Id.* at 612–13, 66 S.Ct. at 405. *See United States v. Clavey,* 565 F.2d 111, 118 (7th Cir.1977), *modified on other grounds,* 578 F.2d 1219 (7th Cir.) (en banc), *cert. denied,* 439 U.S. 954, 99 S.Ct. 351, 58 L.Ed.2d 345 (1978). Moreover, the parties should be "given an opportunity to be heard before the trial judge respond[s]" to a message

from the jury. *Rogers v. United States,* 422 U.S. 35, 39, 95 S.Ct. 2091, 2094, 45 L.Ed.2d 1 (1975); *see also Rushen v. Spain,* 464 U.S. 114, ——, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983) (per curiam); *United States v. Zielie,* 734 F.2d 1447, 1460 (11th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985); *United States v. Betancourt,* 734 F.2d 750, 759 (11th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 440, 83 L.Ed.2d 365 (1984); *United States v. McDuffie,* 542 F.2d 236, 241 (5th Cir.1976).

■ Here, the district court was not able to respond to the jury's question before the jury rendered a verdict. We are convinced, however, that this was not due to any lack of diligence on the court's part. It appears the judge returned the clerk's telephone call as soon as possible. Rodriguez stipulated that the conference call procedure was an acceptable method of dealing with any questions the jury might have. He should not now be heard to complain merely because there was a short delay in contacting the judge. *See United States v. Barnes,* 586 F.2d 1052, 1060 (5th Cir.1978) (no reversible error where court was unable to answer jury's question prior to return of verdict).

Moreover, any error which occurred was harmless. The verdict shows the jury answered its question correctly before reaching a decision. *See Clavey,* 565 F.2d at 119–20 (no reversible error where verdict shows jury answered question itself). Had the jury thought that it could convict the appellants no matter what they conspired to do, it would not have acquitted Ramirez of conspiracy. It must have concluded the object of the conspiracy was the distribution of cocaine. Had the jury been confused on this point, it would have waited until it received an answer from the district court.[6]

■ Finally, we see no prejudicial error in the court's refusal to answer the question or disclose it to defense counsel. The verdict had already been reached. Answering the question at that point would have been futile. While we do not fully understand the court's reluctance to disclose the question to Rodriguez, we cannot say this was an abuse of discretion. There was nothing counsel could have added or objected to since the court was not going to respond to the question.[7] In short, the failure to answer the question does not require a new trial.

*Use of Hearsay at Sentencing.*

As his final allegation of error, Rodriguez contends that the district court erred in considering certain hearsay evidence before imposing sentence. At the sentencing hearing, a police officer testified that an unidentified informant had told him that Rodriguez, Ramirez and Morla were a part of a major narcotics organization operating in Florida and that Rodriguez acted as a broker for the drugs. The officer had also been told by two different sources, one of whom had been reliable in the past, that Rodriguez and Ramirez were seen together at a farm near Titusville, Florida, in July of 1983, and that Rodriguez was in a vehicle containing a large quantity of marijuana and was carrying a handgun. Another officer corroborated this information to some extent from his sources. His informant, also a member of the narcotics ring, stated that Ramirez and Rodriguez knew each other and that Ramirez was a part of the organization. Rodriguez contends all this material was unreliable and that the trial court's alleged reliance upon it requires resentencing.

■ Federal law places no limitation on the information which a court can con-

---

**6.** The jury was aware that they would have to remain at the courthouse until the judge arrived before the verdict could be published. Thus, there was no rush to reach a verdict.

**7.** In the usual case, "[u]nless counsel is advised of the contents of the jury's message he cannot evaluate the propriety or adequacy of the pro-

posed supplemental charge, formulate objections or suggest additional instructions." *McDuffie,* 542 F.2d at 241. Here, however, because the verdict was already in, no supplemental charge was to be given. Therefore, the failure to disclose the question to counsel was clearly not prejudicial.

sider in determining an appropriate sentence. 18 U.S.C. § 3577 (1976).[8] "[A] judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972); *Roberts v. United States*, 445 U.S. 552, 556, 100 S.Ct. 1358, 1362, 63 L.Ed.2d 622 (1980). However, sentences imposed on the basis of material misinformation may violate due process in some circumstances. *Roberts*, 445 U.S. at 556, 100 S.Ct. at 1362; *Ryder v. Morris*, 752 F.2d 327, 332 (8th Cir.1985); *United States v. Tobias*, 662 F.2d 381, 388 (5th Cir. Unit B 1981), *cert. denied*, 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982).

■ While hearsay evidence may be considered in determining sentence, the accused must be given an opportunity to refute it,[9] and it "must bear minimal indicia of reliability if the defendant's right to due process is to be preserved." *United States v. Reme*, 738 F.2d 1156, 1167 (11th Cir. 1984); *see also United States v. Ammirato*, 670 F.2d 552, 557 (5th Cir. Unit B 1982). In order to prevail on this claim, Rodriguez must establish "(1) that the challenged evidence is materially false or unreliable, and (2) that it actually served as the basis for the sentence." *Reme*, 738 F.2d at 1167.

■ We do not believe Rodriguez has met either of these burdens. First, because the record reveals no "explicit reliance" on the challenged evidence by the judge, Rodriguez has failed to prove it served as the basis for his sentence. *United States v. Clements*, 634 F.2d 183, 186 (5th Cir.1981). The only thing the record shows is that the judge had a "tentative expectation" of imposing a ten year sentence, and that, after the sentencing hearing, he imposed a thirteen year sentence. The court stated that the hearing merely gave it a "little more background upon

which to base [its] sentence." We do not believe this suffices to show that the court explicitly based the sentence on the hearsay evidence. *Cf. Reme*, 738 F.2d at 1167–69 (where the challenged evidence was the "salient factor" in the trial court's decision to impose a sentence "far out of keeping with the local and national averages").

Even assuming the court relied on the evidence in imposing sentence, however, we cannot say it lacked minimal indicia of reliability. Two officers, working independently using different sources, both determined that there was a large narcotics organization operating in the area. Their sources were themselves members of the ring and the informants agreed that Ramirez and Rodriguez knew each other, had been seen together, and that at least Ramirez was a member of the drug organization. Thus, the informants corroborated each other to some extent. More importantly, the evidence adduced at trial indicated that Rodriguez was a narcotics broker with many suppliers of cocaine and that he and Ramirez were linked together in the drug business. Thus, all the testimony at the sentencing hearing was substantially corroborated by the evidence at trial. *Cf. Reme*, 738 F.2d at 1168 (hearsay evidence contradicted by trial evidence). In these circumstances, the hearsay evidence was sufficiently reliable for the district court to consider it for whatever it was worth. We therefore reject Rodriguez's claim that he is entitled to be resentenced.

### B. Ramirez.

*Discovery Violations and Use of Perjured Testimony.*

Ramirez's main contentions involve alleged discovery violations by the government. We first address the government's failure to disclose prior to trial the existence of a silver handcuff key found on Ramirez. Briefly, we review the circum-

---

8. 18 U.S.C. § 3577 provides:

   No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may

receive and consider for the purpose of imposing an appropriate sentence.

9. There is no question that Rodriguez was given this opportunity and he does not contend otherwise.

stances surrounding the key's discovery and ultimate disclosure at trial.

Prior to trial, the district court entered its standing discovery order. Subsequently, both of appellants' attorneys were given the opportunity to view the physical evidence against their clients. Counsel, along with the United States Attorney, went to the Metro Dade Police Department property room to review the evidence. Counsel reviewed the property receipts but, due to the volume of evidence, inspected only part of it.

A short time before trial the government, pursuant to Ramirez's Jencks Act request, provided defense counsel with statements of witnesses, certain property receipts and portions of investigative reports from law enforcement agencies. In reviewing these materials, Ramirez's attorney discovered the existence of a silver handcuff key. The documents indicated that the key was found on the body of Morla as he lay dead in the hotel parking lot.

At trial, Agent Jimenez testified that he was released from the handcuffs placed upon him by Morla with a key that was found in the possession of Ramirez. Counsel impeached this testimony during cross-examination by utilizing the above mentioned discovery materials. Ramirez's attorney made Jimenez admit that he was not present when the key was found, that his direct testimony was based only on what he had been told, and that he had not been aware a key was found on Morla.

DEA Agent Truesdell then testified that, as Ramirez was taken into custody, an object fell out of his pocket to the ground. He stated that Ramirez covered the object with his foot but that another agent saw this, picked up Ramirez's foot, and found a silver handcuff key. The key was then used to remove the handcuffs from Rios and Jimenez.

Ramirez's attorney objected and moved for a mistrial based on the government's failure to disclose this evidence prior to trial. In the ensuing discussion on the motion, the government, for the first time, disclosed the existence of two keys, one found on Morla and one found on Ramirez.

The district court, after finding that the government had failed to disclose the existence of a second key found on Ramirez, excluded the key from evidence, instructed the jury to disregard Agent Truesdell's testimony, but denied the motion for mistrial.[10]

Ramirez contends exclusion of the evidence was inadequate to cure the prejudice resulting from the government's discovery violation. He asserts the government intentionally violated both Fed.R.Crim.P. 16[11] and Fed.R.Crim.P. 12[12] and wilfully set a "trap" for the defense through its "misleading" Jencks Act response. He contends he was completely and unfairly surprised by the tardy disclosure and that, in view of the key's critical nature to the government's case, reversal is the only proper remedy.

**10.** The government subsequently offered to forego producing any further evidence regarding the key. Defense counsel then announced his intention to cross-examine Truesdell. The court cautioned counsel, however, that if he misled the jury the government would be allowed to rehabilitate Truesdell on redirect with reference to his previous testimony. Defense counsel decided not to cross-examine Truesdell. Although Ramirez makes a feeble assertion that this was an improper limitation on his right to cross-examine Truesdell, we find no abuse of discretion in the court's tentative ruling.

**11.** Fed.R.Crim.P. 16(a)(1)(C) provides:
> Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, build-

ings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of his defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

**12.** Fed.R.Crim.P. 12(d)(2) provides in pertinent part:
> At the arraignment or as soon thereafter as is practicable the defendant may, in order to afford an opportunity to move to suppress evidence ..., request notice of the government's intention to use (in its evidence in chief at trial) any evidence which the defendant may be entitled to discover under Rule 16....

Assuming that the government breached its discovery obligations here,[13] we nevertheless do not believe reversal is necessary. Ramirez must show the error prejudiced his substantial rights. *E.g., United States v. Kubiak*, 704 F.2d 1545, 1552 (11th Cir.) (per curiam), *cert. denied,* — U.S. —, 104 S.Ct. 163, 78 L.Ed.2d 149 (1983). "If the defendant was unduly surprised and did not have an adequate opportunity to prepare a defense, or if the mistake had substantial influence on the jury," then reversal may be in order. *United States v. Gonzalez*, 661 F.2d 488, 494 (5th Cir. Unit B 1981) (citations omitted). However, the choice of remedy for a discovery violation lies within the sound discretion of the trial court.[14] *United States v. Hartley*, 678 F.2d 961, 977 (11th Cir.1982), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983); *United States v. Sarcinelli*, 667 F.2d 5 (5th Cir. Unit B 1982). "This discretion will be overturned and a new trial ordered only if the defendant can show that a shortcoming in discovery caused prejudice not cured by the trial court's remedy." *United States v. Bockius*, 564 F.2d 1193, 1196 (5th Cir.1977).

Ramirez has not shown undue prejudice resulting from the district court's choice of sanctions. We first point out that exclusion of the evidence is an "extreme" sanction, *see Sarcinelli*, 667 F.2d at 7; indeed, it is the most severe remedy a court can impose short of declaring a mistrial. Thus, the government was punished harshly for any error it may have committed. Moreover, the court specifically instructed the jury to totally disregard Agent Truesdell's testimony regarding Ramirez's possession of the key.

We also note that while the evidence regarding the key was certainly damaging to Ramirez's defense, there was other evidence linking Ramirez and Morla. A police badge similar to the one Morla used was found in Ramirez's wallet. Ramirez, like Morla, fired upon the law enforcement agents and got into the car in an attempt to flee. In addition, weapons and handcuffs were found in the car driven by Ramirez. Thus, even apart from the evidence of the handcuff key, the jury could properly have inferred that Morla and Ramirez were in league in the attempted "rip off." "[S]ince there was other substantial evidence to support the jury's verdict, it cannot be said that the jury prejudicially relied on the evidence" of Ramirez's possession of a handcuff key. *Gonzalez*, 661 F.2d at 495.

In sum, the trial court was in a much better position to gauge the evidence's effect on the jury and to fashion an appropriate remedy. "[I]t is difficult for an appellate court on a cold record to reproduce accurately for itself the warm vigor and atmosphere of the jury trial." *La Barge Water Well Supply Co. v. United States*, 325 F.2d 798, 801 (8th Cir.1963). The court's choice of exclusion of the evidence, rather than declaring a mistrial, was not an abuse of discretion.

Ramirez's second group of alleged discovery violations revolves around informer Rios' polygraph examination. Prior to trial, the government disclosed to defense counsel that Rios had been given a polygraph examination in August of 1983, a short time before the case was presented to the grand jury. The government further disclosed that, in the opinion of the polygraph examiner, Rios was untruthful in answering three questions, all of which relate to Rios' testimony that he saw Ra-

---

**13.** We would point out that the government, well before trial, permitted defense counsel to view all the physical evidence in its possession. Ramirez contends he did not see any handcuff keys because of the mass of evidence contained in the property room. Had counsel more carefully reviewed this evidence, he might have discovered the handcuff keys. As this circuit has stated, "[t]he discovery process does not obviate the need for thorough trial preparation." *United States v. Gonzalez*, 661 F.2d 488, 495 (5th Cir. Unit B 1981) (quoting *United States v. Arcentales*, 532 F.2d 1046, 1050 (5th Cir.1976)).

**14.** After finding a discovery violation, the trial court "may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." Fed. R.Crim.P. 16(d)(2).

mirez carry a briefcase containing cocaine to the car and place it in the trunk.

Ramirez contends that the government should have disclosed all evidence and information in its possession which suggested the need for the Rios polygraph in the first place. He argues this was discoverable under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He also asserts that the prosecution failed to provide the defense with all the statements Rios allegedly made to government agents, specifically his statement to the polygraph examiner. He argues that this information was discoverable under the Jencks Act, 18 U.S.C. § 3500. Finally, he contends that, at a minimum, the district court should have examined the alleged materials in camera before denying his request.

■ Ramirez has not proven that the government suppressed favorable evidence. Before the government's duty to disclose is triggered, obviously there first must be evidence to disclose. Ramirez has pointed to no specific items of evidence which were not disclosed, and our review of the record reveals no basis for his conclusory allegations of *Brady* violations.[15]

The same can be said of the alleged Jencks Act statements. There simply is nothing in the record to suggest that the government possessed any statement made by Rios which was not disclosed to the defense.

■ The only specific "statement" made by Rios which does appear to exist are his answers to questions from the polygraph examiner. The district court, under-

standably concerned with keeping evidence of a polygraph examination from the jury, denied Ramirez's request for further discovery. Even though we have doubts whether Rios' examination was discoverable under the Jencks Act, the better approach probably would have been for the government to disclose the entire examination to the defense. In the circumstances of this case, however, any error committed was clearly harmless. Counsel was given that portion of the examination which contained Rios' untruthful answers. Moreover, any use to which defense counsel could have put the examination would have been extremely limited since polygraph results are generally inadmissible. *E.g., United States v. Beck*, 729 F.2d 1329, 1332 (11th Cir.) (per curiam), *cert. denied,* —— U.S. ——, 105 S.Ct. 383, 83 L.Ed.2d 318 (1984); *United States v. Clark*, 598 F.2d 994 (5th Cir.1979), (per curiam), *cert. denied,* 449 U.S. 1128, 101 S.Ct. 949, 67 L.Ed.2d 116 (1981).

■ Similarly, the district court's failure to conduct an in camera inspection of the materials was harmless error, if error at all.[16] As stated, much, if not most, of the allegedly undisclosed Jencks material has not even been shown to exist. The Jencks statements which were disclosed by the government appear to be substantially complete and there is no indication that the government excised portions of these materials. Finally, as we have stated, the failure to conduct an in camera inspection of the only existing statements which were only partially disclosed, the polygraph examination, was not reversible error.

**15.** Ramirez simply assumes that there must be evidence which precipitated the government's polygraph testing of Rios. In view of the government's steadfast denial that any such evidence exists, we find Ramirez's assumption untenable. There could be many reasons unrelated to the suppression of exculpatory evidence as to why the government required Rios to take a polygraph test, the most obvious of which is the fact that the cocaine which Rios said Ramirez placed in the car's trunk was not found there. The apparent inconsistency between Rios' testimony and the physical evidence may have caused the government to require the test. We simply have no way of knowing why

the government required the examination. Nevertheless, we are satisfied that Ramirez has failed to show that the prosecution suppressed exculpatory evidence.

**16.** The Jencks Act requires that the government deliver Jencks materials to the trial court for an in camera inspection where the government claims that certain portions of the statements contain matter not relevant to the subject matter of the case. 18 U.S.C. § 3500(c); *United States v. Conroy*, 589 F.2d 1258, 1272–73 (5th Cir.), *cert. denied,* 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979).

Relatedly, Ramirez contends that Rios' alleged untruthful answers show he committed perjury before the grand jury. He argues that the government's use of this testimony before the grand jury justifies dismissal of the indictment.

We disagree. Assuming without deciding that a prosecutor's use of perjured testimony before a grand jury may necessitate dismissal of the indictment,[17] Ramirez has failed to prove "knowing perjury relating to a material matter." *United States v. Flake,* 746 F.2d 535, 538 (9th Cir.1984) (quoting *United States v. Kennedy,* 564 F.2d 1329, 1338 (9th Cir.1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978)). *See United States v. Cathey,* 591 F.2d 268, 272 (5th Cir.1979); *United States v. Sullivan,* 578 F.2d 121, 124 (5th Cir. 1978). In the first place, Rios did not testify before the grand jury. Only the substance of his testimony was presented through the statements of other agents. Second, merely because the prosecutor knew that the polygraph examiner disbelieved Rios when he said that he saw Ramirez place cocaine in the car trunk does not prove the government's knowing use of perjured testimony. More fundamentally, the alleged perjured testimony is only relevant with respect to the conspiracy to distribute cocaine count of the indictment. Because Ramirez was acquitted on this count, he can show no prejudice. Therefore, even were we to accept the validity of Ramirez's accusations of impropriety, such would still not require reversal of the convictions on the remaining counts.

Similarly, we reject Ramirez's claim that the district court committed reversible error in refusing to order an in camera inspection of the grand jury transcripts. He has neither shown the use of perjured testimony which might necessitate such a review nor has he established any prejudice from the denial of his request for inspection.

*Prosecutor's Closing Argument.*

In summation, the prosecutor stated:

Because he's [Ramirez] a liar.... Ladies and gentlemen, he's [Ramirez] phony. Rodriguez is phony. They have disrespect of the law. They disregard people. They spit on the country that's accepted them.

Ramirez contends that this was improper closing argument which deprived him of a fair trial. In order to justify a new trial on this basis, the argument must be both improper and prejudicial to a substantial right of the defendant. *E.g., United States v. Bascaro,* 742 F.2d 1335, 1353 (11th Cir.1984); *United States v. Alonso,* 740 F.2d 862, 874 (11th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 928, 83 L.Ed.2d 939 (1985). The government may not rely on the accused's bad character to win a conviction unless character has been put in issue by the defense. *United States v. Barker,* 553 F.2d 1013, 1025 (6th Cir. 1977). Here, Ramirez did not present any evidence of his general good character.[18]

Moreover, a prosecutor must refrain from improper methods calculated to produce a wrongful conviction. *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). It is well established that the only purpose of closing argument is to help the jury in evaluating the evidence. *United States v. Pearson,*

---

**17.** In *United States v. Cathey,* 591 F.2d 268, 272 (5th Cir.1979), the Fifth Circuit explicitly refused to reach the question whether the rule in *United States v. Basurto,* 497 F.2d 781 (9th Cir. 1974), should be adopted. We likewise do not reach this issue.

**18.** The government contends that its comments were invited. While we may agree that the references to Ramirez's veracity were invited by counsel's argument that the government's witnesses were liars and their testimony manufactured, the comment that appellants spit on their country was invited, if at all, only by Rodriguez, not Ramirez. Thus, the prosecutor's reference to both of them in this respect was unfair. Moreover, "two improper arguments—two apparent wrongs—do not make for a right result." *United States v. Young,* —— U.S. ——, ——, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). While defense counsel's conduct is relevant in determining whether reversal is required for prosecutorial misconduct, we should not approve or encourage the type of "response-in-kind that inevitably exacerbate[s] the tensions inherent in the adversary process." *Id.* 105 S.Ct. at 1045.

746 F.2d 787, 796 (11th Cir.1984); *United States v. Dorr*, 636 F.2d 117, 120 (5th Cir. Unit A 1981). "A prosecutor is ... forbidden to make improper suggestions, insinuations and assertions calculated to mislead the jury" and may not appeal to the jury's passion or prejudice. *United States v. Phillips*, 664 F.2d 971, 1030 (5th Cir. Unit B 1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). It is apparent that the government's rather graphic reference to Ramirez's lack of patriotism was inappropriate.[19] The government virtually concedes this point.

■ Nevertheless, we do not hold that reversal is required. We recognize "that 'in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused.'" *United States v. Young*, — U.S. —, —, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985) (quoting *Dunlop v. United States*, 165 U.S. 486, 498, 17 S.Ct. 375, 379, 41 L.Ed. 799 (1897)). Our task is to determine the probable effect the improper comment had on the jury. *Young*, 105 S.Ct. at 1045. In assessing whether the accused was actually prejudiced by improper argument, we consider the presence of curative instructions and the strength of the government's case. *E.g., Alonso*, 740 F.2d at 874; *United States v. Trujillo*, 714 F.2d 102, 105 (11th Cir.1983). The district court instructed the jury three separate times that the argument of the attorneys was not evidence: once prior to argument, once shortly after the government's rebuttal argument, and, just prior to the jury's deliberations, the court told the jury that "[n]othing the lawyers say to you is evidence, nothing in opening statement or closing argument. I certainly want you to disregard any inflammatory remarks that may have come out during closing argument." The court also instructed the jury to disregard the prosecutor's comments immediately after they were challenged by defense counsel. Thus, we believe any error was cured by the court's cautionary instructions. *See United States v. Vera*, 701 F.2d 1349, 1361 (11th Cir.1983); *United States v. Handly*, 591 F.2d 1125, 1131 (5th Cir.1979). Moreover, the evidence of Ramirez's guilt was substantial, if not overwhelming.

Finally, we point out that any impropriety was isolated and certainly did not permeate the entire trial. *See United States v. Nickerson*, 669 F.2d 1016, 1020 (5th Cir. Unit B 1982). Ramirez was acquitted on one of the counts. "This alone is telling proof that he was not prejudiced by the prosecutor's remarks." *United States v. Drum*, 733 F.2d 1503, 1509 (11th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 544, 83 L.Ed.2d 431 (1984).

■ In sum, while the prosecutor's comment was improper, it did not deprive Ramirez of a fair trial. We remind counsel for the government, however, that "prosecuting attorneys are no longer permitted to indulge themselves, or their audiences, in unrestrained, abusive histronics, giving their personal evaluations of what a low-down fellow the defendant really is." *United States v. Windom*, 510 F.2d 989, 994 (5th Cir.), *cert. denied*, 423 U.S. 863, 96 S.Ct. 121, 46 L.Ed.2d 91 (1975).

*Trial Court's Comments.*

■ Ramirez also contends that the district court deprived him of a fair trial in making the following statement to the jury in which it explained why the trial had been delayed:

> Please be seated ladies and gentlemen. You indeed have been snakebitten. I had a sentencing scheduled this morning and I expected it to take five minutes, eight minutes, one of the many cases we get we call them mules, everybody calls them mules because they are just abused by drug importers to ferry in or pass in cocaine, usually cocaine, heroin, drugs. Nearly always come from Colombia or

---

**19.** The prosecutor's comment that Ramirez spit on the country that accepted him, in conjunction with his other references to Ramirez's Cuban nationality, comes perilously close to an attempt to take advantage of any negative feelings the jury may have had toward recent Cuban immigrants.

Bolivia. They are run of the mill cases and nabbed at customs at Miami International and plead guilty. Sentencing is very routine because we don't get that much information to evaluate on the persons and we must of course be reasonably consistent in your sentencing in that area. One, the pre-sentence report got lost in the mail and finally had to get a courier up here from Miami to bring me the report. Second, I get in here and the lady who, honestly, had the face of a nun, most angelic face in the world, she has a plausible story of the defense of not knowing what was in the package. There is no way I could sentence her. She is entitled to have a trial by jury to decide that issue of fact. It took a long time to pull that tooth, and so that one will be set for trial. And then we always have our own private surprises every day, too. I'm sorry. We are ready to begin now.

Ramirez contends that the court's definition of the term "mule" and its statements that mules are abused by drug dealers, that such cases are "run-of-the-mill" and that they routinely result in guilty pleas severely prejudiced his case in light of the fact that he was on trial for cocaine distribution. He also argues that the court's reference to the woman's "plausible" story as to her lack of guilty knowledge was prejudicial.

■ A trial court may speak to the jury at its discretion; "a federal district court judge is not relegated to complete silence and inaction...." *United States v. Cox*, 664 F.2d 257, 259 (11th Cir.1981). In these circumstances, the court's comments, while unnecessary and perhaps regrettable, did not prejudice Ramirez. Evidence as to "mules" and their abuse had already been testified to by witnesses. The court did not, as Ramirez suggests, express skepticism of the woman's story. In fact, he stated that the woman's story was plausible and that she was credible.

In addition, after counsel objected to the court's "speech," the court immediately gave the following cautionary instruction:

Ladies and gentlemen of the jury, sometimes we create apprehensions when we try to be explanatory, and the lawyers are apprehensive because I have explained about the situation of the sentencing being protracted about the lady from Bolivia because one of the charges in this case involved cocaine that you somehow will have adverse inferences or draw adverse inferences or presumptions against the Defendants here. Believe me, I had no such intention, and I can tell from the looks on your faces that that thought never crossed your mind either. And so please understand, I was just trying to give you a little explanation of why you were cooling your heels, probably having one more cup of coffee that [sic] you are accustomed to drinking. Please understand it. It has nothing at all to do with this case because cases are entirely different. Everything depends on facts and this case depends on the facts and that case depends on its facts. I assure you I have not the slightest interest in any way in the outcome of your decision. In fact, I confess I can hardly wait for closing argument to hear what you do.

This instruction adequately served to alleviate any prejudice which may have inhered to Ramirez due to the court's earlier comments. The primary thrust of the alleged improper commentary dealt with drug distribution. As indicated, however, Ramirez was acquitted on the cocaine conspiracy count. "We do not believe that the jury would have remained objective toward [this charge] while allowing the judge's remarks to influence them on unrelated charges." *Cox*, 664 F.2d at 260.

*Admission of Evidence.*

■ Ramirez's final contention is that the district court erred in allowing into evidence two guns and a silencer. These items were found in the dashboard of the black Buick Ramirez drove on the day of the shooting. The guns were not fired during the course of the incident, and it is undisputed that they were not admitted pursuant to Count V of the indictment, the

count which charged use of a firearm in the commission of a felony. Ramirez contends that these items of evidence were irrelevant and excessively prejudicial.

As the government asserts, however, weapons such as these are many times "tools of the trade" for drug dealers. *United States v. Montes-Cardenas,* 746 F.2d 771, 776–77 (11th Cir.1984). The evidence therefore had circumstantial relevance to Ramirez's intent on the drug conspiracy count and to tying Ramirez and Morla together on an aiding and abetting theory on the remaining counts. *See, e.g., United States v. Pomerantz,* 683 F.2d 352, 353 (11th Cir.1982) (per curiam) (possession of gun relevant to support conviction for possession of marijuana with intent to distribute); *United States v. Perez,* 648 F.2d 219, 224 (5th Cir.), *cert. denied,* 454 U.S. 1055, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981) (guns relevant as tools of trade of drug dealers); *United States v. Pentado,* 463 F.2d 355, 360 (5th Cir.1972) (possession of gun relevant to show intent to promote and protect narcotics conspiracy), *cert. denied,* 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 271 (1973). While there was no evidence as to who actually owned the car in which the guns were found, Ramirez told the group that they could take "his car" to make the exchange and he drove the vehicle to the hotel.

The trial court is given broad discretion in determining whether evidence is relevant and whether the probative value of the evidence outweighs unfair prejudice to the defendant. *E.g., United States v. Hernandez-Cuartas,* 717 F.2d 552, 554 (11th Cir.1983). We cannot say the district court clearly abused its discretion in admitting this evidence.[20]

## III. CONCLUSION.

While the proceedings were not perfect, none of the errors complained of deprived the appellants of a fair trial. Therefore, their convictions are AFFIRMED.

---

**20.** While the better practice probably would have been to allow the admission of the evidence under an instruction limiting the purpose for which it could be used, *see* Fed.R.Evid. 105;

*United States v. Marino,* 658 F.2d 1120, 1124 (6th Cir.1981), Ramirez did not request such an instruction. The failure to give such a limiting charge sua sponte was not plain error.