[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Nov. 5, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-12668
Non-Argument Calendar

_____

D. C. Docket No. 07-80005-CR-KLR

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FRANCISCO CARDENAS-SANCHEZ,
a.k.a. Pancho,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 5, 2009)

Before BLACK, BARKETT and HULL, Circuit Judges.

PER CURIAM:

Defendant Francisco Cardenas-Sanchez appeals his convictions for (1) conspiracy to possess with intent to distribute 5 kilograms or more of cocaine and 500 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A), and § 846, and (2) possession with the intent to distribute 5 kilograms or more of cocaine and 500 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a) and (b)(1)(A). On appeal, Cardenas-Sanchez argues that the government engaged in prosecutorial misconduct in its closing argument, warranting a new trial. After review, we disagree and affirm Cardenas-Sanchez's convictions.

## I. BACKGROUND

### A. Offense Conduct

In 2004, a joint Drug Enforcement Agency ("DEA") and state law enforcement task force (the "task force") began investigating an extensive narcotics network responsible for importing cocaine and methamphetamine from Mexico and distributing the drugs throughout the southern United States. The task force identified three primary distributors in the United States: (1) Ranferi Gonzalez-Hernandez ("Ranferi"), (2) Servando Hernandez-Maldonado

("Servando"), and (3) Gonzalo Gonzalez-Borja ("Gonzalo").[1]  In September 2006, the task force obtained court authorization to intercept calls on cell phones used by key figures in the drug ring, including Ranferi and Servando.  Ranferi supplied and oversaw a drug distribution network in West Palm Beach, Florida.  Ranferi's nephew, Rafael Ortiz-Gonzalez ("Rafael"), managed the daily business of this operation.  Defendant Cardenas-Sanchez worked for Ranferi and Rafael.

On a weekly basis, Ranferi "fronted" drugs to defendant Cardenas-Sanchez, a cocaine wholesaler.  A ledger that the task force seized early in its investigation listed defendant Cardenas-Sanchez as having received a supply of drugs from Ranferi.  Additionally, once the task force began court-authorized wiretapping, DEA agents overheard Defendant Cardenas-Sanchez soliciting cocaine shipments from Ranferi and Rafael for resale.

Defendant Cardenas-Sanchez's principal value to Ranferi's drug trafficking organization was as a "facilitator."  Almost all of the drug ring's leadership, including Ranferi, Servando, and Rafael, were illegal aliens without strong English language skills.  Defendant Cardenas-Sanchez's proficiency in English, lawful presence in the United States, and possession of a valid social security

---

[1]Ranferi and Servando were responsible for importing approximately seventy-five to one hundred kilograms of cocaine into the United States per month.

number and driver's license allowed him to perform a number of essential functions for this drug trafficking organization. For example, defendant Cardenas-Sanchez leased and maintained a secluded residence from which smuggled narcotics from Mexico were received, opened, and distributed.[2] In addition, defendant Cardenas-Sanchez registered in his name vehicles used to traffic narcotics, leased premises used as "stash" houses, and subscribed to water and electrical utilities. Ranferi often paid defendant Cardenas-Sanchez in cocaine for his services.

The task force also detected and seized two narcotics deliveries in which defendant Cardenas-Sanchez was directly involved. In early October 2006, the task force intercepted telephone calls indicating that a Mexican source had shipped 35 kilograms of cocaine and 750 grams of methamphetamine to West Palm Beach hidden in a secret compartment of a black van. As the black van was heading to defendant Cardenas-Sanchez's unloading site, police officers stopped the black van, arrested the driver for failure to possess a valid license, and impounded the vehicle. Once at the impound lot, police searched the black van and discovered the drug cache. The police removed the drugs and reconstructed the secret compartment.

---

[2]During 2006, the network received approximately twelve such deliveries.

Rafael had followed the black van in a separate vehicle after its arrival in West Palm Beach. Ranferi believed that the police had not discovered the hidden drugs, and asked defendant Cardenas-Sanchez to obtain the vehicle's release, offering him a share of the drugs that Ranferi hoped to recover from the van. Defendant Cardenas-Sanchez accepted and recovered the black van. Only after Ranferi instructed defendant Cardenas-Sanchez to retrieve the drugs from the van did Cardenas-Sanchez discover that the secret compartment was empty. Regardless, Ranferi promised to reward defendant Cardenas-Sanchez's efforts with a quantity of drugs.

A few months later, in December 2006, the task force learned from the wire taps that a 15 kilogram cocaine shipment would arrive shortly in West Palm Beach, where Ranferi, Servando, and Gonzalo, the network's three primary distributors, would divide it. Two female couriers, Anita Ramos-Pacheco ("Anita") and Sulma Chaves ("Sulma"), would deliver the shipment from Mexico in a hidden compartment in a Ford Explorer truck.

Police followed the truck after its arrival in West Palm Beach. While the truck was left unattended, police staged an "accident." When courier Anita returned to the truck, the police told Anita that a drunk driver hit the truck. After Anita consented to a search of the truck, the police found a small quantity of

cocaine in plain view, along with a firearm and a substantial amount of cash. Police arrested Anita for simple cocaine possession and impounded the truck. At the impound lot, police discovered the hidden compartment and removed 15 kilograms of cocaine.

Courier Sulma notified Servando of the truck's seizure and Ranferi asked defendant Cardenas-Sanchez to retrieve the truck. As compensation for defendant Cardenas-Sanchez's services, Servando delivered an eighth of a kilogram of cocaine to Cardenas-Sanchez. Before defendant Cardenas-Sanchez could actually retrieve the truck, however, the Mexican sources became suspicious that Anita and Sulma, the female couriers, had stolen the drugs. Ranferi, Servando, and Gonzalo agreed to finance the kidnaping and torture of Anita and Sulma in order to determine their knowledge of the drugs' disappearance. When the task force intercepted their plan over the wire taps, it terminated the surveillance and arrested conspirators Ranferi, Rafael, Servando, Gonzalo, Sulma, and Anita, among others.

## B. Indictment and Trial

The indictment charged defendant Cardenas-Sanchez with one count of conspiracy to possess with intent to distribute 5 kilograms or more of cocaine and 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846, and two counts of possession with the intent to distribute 5 or

more kilograms of cocaine and 500 or more grams of methamphetamine in connection with the cocaine shipments seized in October and December 2006, in violation of § 841(a) and (b)(1)(A). At trial, the government provided recordings of the three months of wire taps, along with the testimony of Agent Turke, the task force's lead case agent. The wire tap recordings revealed numerous requests from defendant Cardenas-Sanchez to Ranferi and Rafael for drugs and demonstrated Cardenas-Sanchez's knowing involvement in the criminal activity of this large drug network. The government also provided the testimony of codefendants Ranferi, Rafael, Anita, Sulma, and Servando, all of whom testified to defendant Cardenas-Sanchez's knowing involvement in the drug network generally and in the recovery of the vehicles carrying the October and December 2006 drug shipments in particular.[3] Additionally, Ranferi testified that, before becoming one of the drug network's primary distributors, he had started out as a low-level dealer himself.

Defendant Cardenas-Sanchez presented no evidence at trial. During closing arguments, his counsel asserted that the government had failed to meet its burden of proof. Defendant Cardenas-Sanchez claimed to be an unwitting facilitator of

---

[3]Ranferi, Rafael, Servando, Anita, and Sulma were defendant Cardenas-Sanchez's codefendants. All five codefendants pled guilty and testified for the government at defendant Cardenas-Sanchez's trial with the hope of reducing their sentences.

the criminal activities and that others, such as Rafael and Ranferi, were much more serious violators.

In response, the prosecutor remarked that sophisticated drug networks require the assistance of many different participants and pose serious societal threats. The prosecutor stated:

> [Cardenas-Sanchez's counsel] talked to you about the cooperating defendants, specifically Ran Feri [sic], about Ran Feri's willingness to chip in money to [the Mexican source] in order to have these girls picked up. There isn't any question that Ran Feri was ruthless, that he was a drug lord, that he was importing hundreds of kilograms of cocaine into the United States and that he was responsible for distributing that cocaine.
>
> Drugs are destructive and the drug trade is destructive. No one condones what Ran Feri did. He's cooperating with the Government and trying to get favorable treatment. But no one here condones what he did. And his actions are inexcusable. But this is the reality of the drug business. It's a violent, dangerous business. Those two girls that you heard testify this week are lucky to be alive today. And it's because this business is so violent and so dangerous that every single person that is involved in it needs to be held accountable.

At this point, defendant Cardenas-Sanchez's counsel objected. The district court overruled the objection. The prosecutor continued:

> Every single person that is involved in this type of activity needs to be prosecuted and needs to be held accountable. There's no such thing as a minor participant, a person that's not worth pursuing, a small-scale user. Everybody

8

involved needs to be held accountable. There isn't any exception. The defendant is no exception.

It takes the active participation of a lot of different people to do what Ran Ferry's [sic] doing: [i]mporting and distributing hundreds of kilograms of cocaine. And the defendant was right there with him. And that's why everybody that you saw, the cooperating defendants that came in here and took the witness stand and testified, they are all in jail because they participated. So did the defendant, and he needs to be held accountable too for that. He was right there with them. He knew exactly what they were doing every step of the way. He was benefitting from it. He was taking cocaine from them, and he's responsible just like they are.

Plus, look at how Ran Feri started. Ran Feri is this ruthless drug lord, admittedly. Look at how he started. Ran Feri was moving small quantities of cocaine when he first started out, just like the defendant was, just like the defendant. And look how Ran Feri ended up. He ended up being responsible for a lot of destruction and a lot of damage. And that's why none of it can be condoned. Whether it's a small-scale distributor like the defendant or a major drug lord like Ran Feri, it all has to be prosecuted. And they are all held accountable.

Defendant Cardenas-Sanchez's counsel did not object to these statements. The jury convicted Cardenas-Sanchez on all counts. The district court sentenced Cardenas-Sanchez to 151 months' imprisonment.

## II. DISCUSSION

On appeal, defendant Cardenas-Sanchez argues that the government engaged in prosecutorial misconduct in its closing argument by first improperly

9

comparing him to Ranferi. Cardenas-Sanchez argues that, after his objection, the prosecutor exacerbated the misconduct when he later asserted that the jury must convict Cardenas-Sanchez so that he would not become a drug lord like Ranferi.

Because defendant Cardenas-Sanchez objected to the first statement that he challenges on appeal, we review that statement <u>de novo</u>.[4] We review the second statement, to which Cardenas-Sanchez did not object, for plain error.[5]

"To establish prosecutorial misconduct, (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." <u>Eckhardt</u>, 466 F.3d at 947 (internal quotation marks omitted). A statement prejudicially affects the defendant's substantial rights "when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." <u>Id</u>. When, however, the record contains sufficient independent evidence of the defendant's guilt, the prosecutorial misconduct is harmless. <u>Id</u>.

---

[4]We review a claim of prosecutorial misconduct during closing arguments <u>de novo</u> because it is a mixed question of law and fact. <u>United States v. Eckhardt</u>, 466 F.3d 938, 947 (11th Cir. 2006).

[5]When a defendant fails to object contemporaneously, we review the defendant's claim of prosecutorial misconduct during closing argument for plain error. <u>United States v. Newton</u>, 44 F.3d 913, 920 (11th Cir. 1995). To show plain error, the defendant has the burden of establishing: (1) an error occurred, (2) the error is plain, (3) the error affected the defendant's substantial rights in that it was prejudicial and not harmless, and (4) the error seriously affects the fairness, integrity, or public reputation of the proceedings. <u>United States v. Beckles</u>, 565 F.3d 832, 842 (11th Cir. 2009).

During closing arguments, a prosecutor may not make improper suggestions to mislead the jury or appeal to the jury's "passion or prejudice." United States v. Rodriguez, 765 F.2d 1546, 1560 (11th Cir. 1985). A prosecutor may, however, state conclusions drawn from the evidence, and "there is no prohibition on 'colorful and perhaps flamboyant' remarks if they relate to the evidence" shown at trial. United States v. Bailey, 123 F.3d 1381, 1400 (11th Cir. 1997) (citation omitted).

Defendant Cardenas-Sanchez argues that the prosecutor's first statement, to which he objected, was improper because it constituted a comparison between his actions and Ranferi's violence. Defendant Cardenas-Sanchez mischaracterizes the prosecutor's statement. The prosecutor did not say that defendant Cardenas-Sanchez was violent and dangerous like Ranferi, but that the illegal drug business is so dangerous that all those involved should be held accountable. This remark was simply an explanation of why it is important to prosecute even seemingly minor drug offenders and was made in response to Cardenas-Sanchez's argument in closing that Ranferi and Rafael were much more serious drug traffickers. We previously have upheld prosecutors' descriptions, during closing arguments, of the societal harm drug trafficking fosters. See, e.g., United States v. Delgado, 56 F.3d 1357, 1370 (11th Cir. 1995) ("[r]eference during closing argument to the drug

11

problems of society and defendants' roles in such problems are not unduly prejudicial or excessively inflammatory") (quotation marks omitted).

Defendant Cardenas-Sanchez also asserts that the prosecutor's second statement, to which he did not object, was improper. Contrary to Cardenas-Sanchez's contention, the government was not asserting that Cardenas-Sanchez would become a drug lord like Ranferi. Rather, the prosecutor was offering further explanation about why minor drug offenders must be held accountable for their crimes. Even if the government was arguably suggesting that Cardenas-Sanchez could become a violent drug lord, this insinuation was not improper because it was supported by Ranferi's testimony of his own career trajectory. See Bailey, 123 F.3d at 1400. At a minimum, we cannot say the prosecutor's second statements were plain error.[6]

In any event, Cardenas-Sanchez has not carried his burden to show that the remarks affected his substantial rights. The record contained overwhelming evidence from which the jury could conclude that Cardenas-Sanchez was guilty. At trial, the government consistently showed that Cardenas-Sanchez was a cocaine wholesaler and knowing facilitator for the drug distribution network through

---

[6]We also reject Cardenas-Sanchez's claim that either of the statements spoke to the veracity of the government's witnesses' testimonies.

numerous recorded telephone conversations, the testimony of Agent Turke, and the testimonies of Ranferi, Rafael, Anita, Sulma, and Servando.  The testimony also showed that defendant Cardenas-Sanchez knew the impounded black van and the Ford Explorer truck contained drugs, and that he requested drugs as compensation for his services.

**AFFIRMED**.