**Ian LIGHTBOURNE, Petitioner-Appellant,**

v.

**Richard L. DUGGER, Secretary, Florida Department of Corrections, Robert A. Butterworth, Attorney General, Respondents-Appellees.**

**No. 86–3643.**

United States Court of Appeals, Eleventh Circuit.

Sept. 18, 1987.

Rehearing and Rehearing En Banc Denied Nov. 30, 1987.

James D. Crawford, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for petitioner-appellant.

Robert A. Butterworth, Atty. Gen., Sean Daly, Asst. Atty. Gen., Daytona Beach, Fla., for respondents-appellees.

Before FAY, ANDERSON and EDMONDSON, Circuit Judges.

PER CURIAM:

This appeal challenges a denial of a Petition for Writ of Habeas Corpus. Ian Lightbourne, (hereinafter petitioner), was found guilty of premeditated murder and felony murder in the perpetration of burglary and sexual battery in Marion County, Florida. Petitioner is incarcerated in a Florida correctional facility awaiting execution. The United States District Court for the Middle District of Florida denied petitioner's claims for relief under 28 U.S.C. § 2254 (1982). Because we conclude that petitioner has failed to establish that either his conviction or sentence are violative of the Constitution and laws of the United States, we affirm.

## I. BACKGROUND

### A. Facts

Nancy Alberta O'Farrell was the daughter of a thoroughbred horse breeder in Ocala, Florida. On January 16, 1981, the O'Farrell family, with the exception of Nancy, attended an awards dinner in Hialeah, Florida. Nancy stayed behind in her cottage located at the edge of the stud farm in order to address some brochures for a horse sale scheduled for Sunday, January 18, 1981. Nancy was last seen alive at approximately 5:30 p.m. on Friday, January 16, 1981. Sometime during Friday evening, Nancy was sexually assaulted and fatally wounded with a gun.

On Saturday, January 17, 1981, Nancy's sister, Mrs. Mary Lewis, and her husband arrived at Nancy's cottage to pick up some furniture. Mr. and Mrs. Lewis discovered a broken window and entered the residence

through an unlocked sliding glass door. Nancy's body, dressed only in a bra and panties, was found lying on her bed. Mr. and Mrs. Lewis attempted to contact the police and noticed that the telephone wires had been cut. When the authorities arrived, Nancy's body was examined for signs of life. After none were found, officials from the Marion County Sheriff's Office secured the scene and conducted an investigation.

A pillow was found by Nancy's head and a pool of blood was discovered under her body. The source of the blood was traced to a gunshot wound just inside the hairline near the left temple. When Nancy's body was removed from her bed, a .25 caliber shell casing was detected. The bedspread on which Nancy was lying was taken to headquarters and examined for the presence of hairs and fibers.

On January 18, 1981, an autopsy was performed on Nancy's body. An X-ray showed the existence of a bullet in the right posterior portion of Nancy's head. The bullet was retrieved, evidence of rape was preserved, and blood and hair samples were taken.

On January 24, 1981, petitioner was arrested in Ocala for carrying a concealed weapon. Petitioner, a twenty-one year old native of New Providence, Nassau, was found sleeping in his car in the possession of an RG .25 caliber semi-automatic pistol with black tape wrapped around the handle. Petitioner was seen by the Ocala police with this gun on January 15, 1981, the day before Nancy died.[1] At the time of the arrest, petitioner listed the Ocala stud farm as his address. Petitioner was formerly employed by the stud farm as a groom, and he informed the arresting officer that although he no longer lived or worked at the O'Farrell ranch, he still received his mail there.

While petitioner was detained pending the concealed weapon charge, he made some incriminating statements to his cellmates. These statements were reported to the authorities. On February 3, 1981, when petitioner was questioned by officials from the Marion County Sheriff's Department, he admitted that he owned the .25 caliber pistol found on his person and that he owned a rose shaped pendant bearing three Greek letters attached to a fine gold chain. Petitioner was charged with murder after a ballistics report connected petitioner's gun to the homicide. An indictment was filed on February 18, 1981. The indictment accused petitioner of premeditated murder and felony murder in the perpetration of either burglary, sexual battery, or both.

Petitioner was tried in the Circuit Court of the Fifth Judicial Circuit in Marion County, Florida. At trial, Dr. Gertrude Warner, an Associate Medical Examiner for Marion County, testified that she was the pathologist who performed the autopsy. According to Dr. Warner, the cause of Nancy's death was a brain hemorrhage precipitated by the gunshot wound. Dr. Warner further testified that an analysis of bodily fluids revealed that Nancy had engaged in sexual relations within forty-eight hours of the examination.

Keith R. Paul, a forensic serologist from the Florida State Crime Laboratory, testified about tests performed on Nancy's clothing. A blood and semen analysis revealed the presence of type B blood factors and phosphoglucomutase (PGM) enzyme type 2-1. Both of these blood factors matched the results of tests performed on samples of petitioner's blood. Nancy had type O blood and PGM type 1.

Charles R. Meyers, a laboratory analyst and specialist in forensic ballistics testified that he examined the pillow found next to Nancy's head and detected a bullet hole passing through it. According to Meyers, residue found on the pillow indicated that a

---

1. On January 15, 1981 at approximately 3:30 a.m., Officer George Clark of the Ocala Police responded to a suspicious vehicle call and found petitioner asleep in a car. Petitioner produced his Florida driver's license. Officer Clark observed a weapon on the floor of the car in plain view. Upon inspection, Officer Clark noticed that the weapon was a .25 caliber RG semi-automatic pistol with black tape wrapped around the handle. Officer Clark returned the weapon to petitioner because he was not in violation of any state or local laws.

gun had been fired within close proximity. Also, Meyers compared the bullet retrieved during the autopsy with bullets test fired from petitioner's gun. In Meyers's opinion, the bullet which caused the death of Miss O'Farrell was fired from the same gun. In addition, Meyers compared the .25 caliber shell casing found in Nancy's bed to those used to test fire petitioner's gun. In Meyers's opinion, the similarity of markings on the primers indicated that the spent shell recovered from Nancy's bed was fired from the same weapon.

Mary Ann Mayer, a microanalyst employed by the Florida Department of Law Enforcement, testified that she performed examinations of hairs collected from Nancy's bedspread. After comparing one hair to samples taken from petitioner, Mayer found that the hair recovered from Nancy's residence was microscopically identical to petitioner's pubic hair. Mayer stated that it was extremely rare for individuals to have hair with precisely the same characteristics.

The necklace found in petitioner's possession was identified as Nancy's Alpha Omega Pi sorority lavaliere. Nancy's relatives testified that the necklace was unique and easily identifiable because Nancy had attached a Madonna cameo to the back of the pendant. Nancy's financial records reflect that she cashed a check for $150 on January 14, 1981. Nancy's relatives testified that only $2.00 was recovered from Nancy's residence after her death.

Theodore Chavers, a cellmate in the Marion County Jail testified that petitioner "knew too much"[2] about the details of Nancy's death and made some incriminating statements during the course of their conversations. According to Chavers, petitioner made references indicating that he entered Nancy's house, encountered her as she was coming out of the shower, forced her to engage in sexual intercourse, and shot her[3] despite pleas for mercy. This version of the facts was corroborated by Theophilus Carson,[4] another cellmate in the Marion County Jail. According to Carson, petitioner admitted forcing Nancy to have sex, shooting her because she could identify him, and taking a necklace and some money.

On April 25, 1981, the jury returned a guilty verdict and a judgment of conviction was entered by the circuit court for premeditated murder and felony murder in the perpetration of burglary and sexual battery. On May 1, 1981, the jury recommended the death penalty. After considering the pre-sentence investigation report and weighing the aggravating and mitigating circumstances, the circuit court imposed the sentence of death.

### B. Procedural History

Petitioner's conviction and sentence were affirmed on direct appeal. *Lightbourne v. State*, 438 So.2d 380 (Fla.1983), *cert. denied*, 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984). The Governor of Florida heard argument in favor of clemency on May 10, 1984. Approximately one year later, the Governor determined that executive clemency was not warranted and signed a death warrant authorizing petitioner's execution on June 4, 1985. Petitioner filed an emergency application for a stay of execution on May 31, 1985. The state circuit court construed the application as a motion for post-conviction relief pursuant to Fla.R.Crim.P. 3.850. The circuit court denied both the stay and the rule 3.850 motion. The Florida Supreme Court affirmed. *Lightbourne v. State*, 471 So.2d 27 (Fla.1985).

A Petition for a Writ of Habeas Corpus was filed on June 3, 1985, in federal district court. The district court reviewed as much of the record as possible on the eve of petitioner's scheduled execution and en-

---

**2.** According to Chavers, petitioner knew that the police would find no fingerprints, knew that the telephone wires had been cut, and knew that Nancy was found lying on her back.

**3.** Although Chavers's testimony reveals that petitioner never explicitly admitted killing Nancy, Chavers stated that petitioner never denied it and made statements giving rise to the inference that he took her life.

**4.** Also known as James T. Gallman.

tered an order staying the death sentence pursuant to 28 U.S.C. § 2254. On August 20, 1986, the district court denied the petition. After reviewing the record and applicable law and assessing the merits of petitioner's claims,[5] we affirm.

## II. DISCUSSION

### A. *Self Incrimination*

Petitioner argues that police interrogators violated *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in the course of obtaining incriminating statements during custodial interrogation. The record reflects that on February 3, 1981, Investigator LaTorre advised petitioner of his *Miranda* rights and questioned him after petitioner responded that he understood these rights and "had nothing to hide." At some point during the interview, petitioner asked whether he had to continue with the interrogation. LaTorre asked petitioner what he meant by that question and whether he wanted to take a break. At that point, and apparently without elaboration or indication that petitioner desired a respite,[6] petitioner continued the conversation and admitted that he owned the .25 caliber pistol and necklace found in his possession. Later, after petitioner stated that he wished to say nothing further, the questioning was terminated.

In *Miranda,* the Supreme Court established procedural safeguards to secure the privilege against self-incrimination. *See*

*Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. In order to combat the evils associated with the "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," *Miranda,* 384 U.S. at 467, 86 S.Ct. at 1624, accused individuals must be informed that statements made may be used as evidence against them, that they have a right to the presence of counsel, and that they have a right to remain silent. *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. An individual may effectively waive these rights "provided the waiver is made voluntarily, knowingly and intelligently." *Id.*

■ Once informed of *Miranda* rights, an accused has the burden of indicating in some manner his wish to remain silent. *United States v. Alegria,* 721 F.2d 758, 761 (11th Cir.1983); *United States v. Bosby,* 675 F.2d 1174, 1182 n. 13 (11th Cir.1982); *see Miranda,* 384 U.S. at 473–74, 86 S.Ct. at 1627. Petitioner contends that he unequivocally indicated his desire to assert his privilege against self-incrimination by asking whether he had to continue with the questioning. This contention was raised in a motion to suppress.

The state circuit court conducted a hearing on April 14, 1981 and considered the testimony of Officer LaTorre and petitioner. In addition, the court reviewed a twenty minute videotape of the interrogation in question.[7] After reviewing the testimony,

---

**5.** In addition to the claims discussed, petitioner also contends that trial counsel was ineffective in failing to request the sequestration of the jury between conviction and sentencing. Because this issue was not raised in petitioner's Petition for Writ for Habeas Corpus, this court will not consider the issue. *See McGahee v. Massey,* 667 F.2d 1357, 1361 n. 10 (11th Cir.), *cert. denied,* 459 U.S. 943, 103 S.Ct. 255, 74 L.Ed.2d 199 (1982).

**6.** Although the interrogation in question was videotaped, neither that recording nor a transcript of it were made part of the trial record. The court reporter found the audio portion of the recording unintelligible, untranscribable and uncertifiable. Accordingly, a precise review of the dialogue is unfeasible and we must rely on the trial testimony.

**7.** Petitioner alleges that the district court erroneously failed to view the videotape of petition-

er's interrogation. As previously indicated, this untranscribable tape was considered by the state circuit court during the suppression hearing but was not made part of the record. Petitioner had access to the tape at the time of trial. No motion to supplement the record has been filed. In the absence of extraordinary circumstances, a court of appeals cannot consider evidence which does not appear in the record. *Lee County Branch of NAACP v. City of Opelika,* 748 F.2d 1473, 1481 (11th Cir.1984).

Even if this court disregarded the presumption of correctness attaching to subsidiary factual questions, acquired access to the video tape, and concluded that an opportunity to view the tape might be helpful when reviewing the voluntariness of petitioner's statements, we hold that an examination of this evidence would not be beneficial to petitioner. Any violation of *Miranda* which the tape might reveal would, at

the arguments of counsel and the pertinent law, the circuit court ruled that the statements made by petitioner were freely and voluntarily made after an explanation and waiver of *Miranda* rights.

On direct appeal, the Florida Supreme Court concurred with the circuit court's determination of voluntariness. *Lightbourne*, 438 So.2d at 389. The supreme court concluded that petitioner's "mid-interview inquiry" after the government officials complied with the *Miranda* requirements "did not rise to the level of a reassertion of his *Miranda* rights requiring a second waiver of those rights." *Lightbourne*, 438 So.2d at 389. In the alternative, the court ruled that even if petitioner's question constituted an attempt to invoke the right to remain silent, petitioner's "subsequent actions evidenced a second knowing waiver after such attempt." *Id.*

In accordance with the Supreme Court's decision in *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), the district court made an independent determination of voluntariness in petitioner's federal habeas corpus proceeding. The district court, emphasizing the facts that petitioner's inquiry was equivocal, that the government responded by attempting to clarify the question, and that petitioner clearly demonstrated the ability to discontinue the statements in question, concluded that petitioner did not reassert his right to remain silent after waiving it. After a *de novo* review of the record and plenary consideration of the voluntariness issue, we affirm.

As this court has acknowledged, "[i]f the individual indicates *in any manner*, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Martin v. Wainwright*, 770 F.2d 918, 923 (11th Cir.1985) *modified on other grounds*, 781 F.2d 185 (11th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986) (emphasis in original) (quoting *Miranda*, 384 U.S. at 473–74, 86 S.Ct. at 1627). Nevertheless, when a purported invocation of a Fifth Amendment privilege is ambiguous, the police may question the accused for the narrow purpose of "clarifying [the] equivocal request." *Martin*, 770 F.2d at 924 (quoting *Thompson v. Wainwright*, 601 F.2d 768, 771 (5th Cir.1979). Once it is clear that an accused wishes to remain silent, the desire to discontinue the interrogation must be "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975); *see United States v. Hernandez*, 574 F.2d 1362, 1369 (5th Cir. 1978).[8]

 In federal habeas court, a statutory presumption of correctness applies to "subsidiary factual questions" resolved in state court proceedings. *Agee v. White*, 809 F.2d 1487, 1493 (11th Cir.1987); *see* 28 U.S.C. § 2254(d). Thus, the state court finding that petitioner merely asked "whether he had to continue" before making the incriminating statements will be presumed correct. *See Lightbourne*, 438 So.2d at 389. Although the Florida Supreme Court's determination that the statements made after this question was asked were voluntarily given is not binding on

best, be considered harmless error. The statements made by petitioner were not an essential and integral part of the state's case. Investigator LaTorre's testimony established that petitioner was arrested in possession of the gun and the necklace. Lewis Williams, an acquaintance of petitioner, identified the .25 caliber pistol found on petitioner's person as the gun which Williams sold to petitioner in November, 1980. Petitioner was seen by the Ocala police in possession of the weapon one day before the homicide occurred. *See supra* note 1. The ballistics report tied the O'Farrell murder to petitioner's gun. Given these facts adduced at trial, the statements made by petitioner regarding the ownership of the gun and the necklace constituted cumulative evidence, did not concern seri-

ously contested issues of fact, and addressed largely self-evident matters. After reviewing the record, we conclude that had the allegedly improper statements been excised, it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilt. *See United States v. Hasting*, 461 U.S. 499, 510–11, 103 S.Ct. 1974, 1981–82, 76 L.Ed.2d 96 (1983); *United States v. Davidson*, 768 F.2d 1266, 1272 (11th Cir.1985).

8. The Eleventh Circuit, in *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

this court, *see Miller*, 106 S.Ct. at 451–53, "the federal habeas court, should ... give great weight to the considered conclusions of a coequal state judiciary." *Miller*, 106 S.Ct. at 451. After making an independent determination of whether petitioner's statements unambiguously evinced an intent to reassert the privilege against self-incrimination, we find that the district court properly concluded that petitioner did not positively and adequately assert his right to discontinue the questioning and therefore volunteered the statements after the police attempted to clarify an equivocal request. As this court has observed, "[v]oluntary comments unresponsive to governmental questioning are admissible even after *Miranda* rights are asserted." *United States v. Suggs*, 755 F.2d 1538, 1542 (11th Cir. 1985). "The sole concern of the Fifth Amendment, on which *Miranda* is based, is governmental coercion." *United States v. Phillips*, 812 F.2d 1355, 1362 (11th Cir. 1987) (quoting *Colorado v. Connelly*, —— U.S. ——, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986)). Here, the record reflects that after the police attempted to clarify petitioner's question, petitioner spontaneously resumed discussions concerning the gun and the necklace without inducement. Under these facts, we fail to discern any governmental coercion.

### B. *The Jailhouse Informant and the Right to Counsel*

Petitioner argues that he was denied the right to the assistance of counsel in violation of *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and its progeny, by the admission of incriminating statements made to cellmate Chavers. The record reflects the petitioner was placed in a cell with Chavers on January 29, 1981. Approximately three days later, Chavers contacted Investigator LaTorre and informed LaTorre that he suspected that petitioner was involved with the O'Farrell homicide. LaTorre told Chavers to "go back to the cell and keep your ears open." Petitioner was formally charged with the murder on February 3, 1981. According to Chavers, petitioner made several incriminating statements af-

ter becoming the subject of official investigation. Petitioner purportedly admitted entering Nancy's house and sexually assaulting her. Chavers was released from custody on February 10, 1981, and received a $200 reward offered by the sheriff's department for supplying the information.

Petitioner filed a motion to suppress Chavers's testimony on March 31, 1981. The circuit court held an evidentiary hearing on April 9, 1981. Investigator LaTorre testified that he never promised that Chavers would receive any money or other consideration in exchange for any information. LaTorre stated that he did, however, assist Chavers in obtaining bail. After hearing LaTorre's testimony and the arguments of counsel, the circuit court found that Chavers did not take actions deliberately designed to elicit incriminating statements and denied the motion to suppress.

On direct appeal, the Florida Supreme Court affirmed. In the words of that court:

> there is nothing in the record establishing that the informant Chavers had any prearranged guarantee of money in return for information, and it appears that the two hundred dollars that he did receive from the Marion County Sheriff's Department was drawn from a general reward fund and not given as an inducement to elicit information.
>
> Similarly, Investigator LaTorre's advice to the informant Chavers to keep his ears open does not constitute an attempt by the state to deliberately elicit incriminating statements. Without some promise or guarantee of compensation, some overt scheme in which the state took part, or some other evidence of prearrangement aimed at discovering incriminating information we are unwilling to elevate the state's actions in this case to an agency relationship with the informant Chavers.

*Lightbourne*, 438 So.2d at 386.

In *Massiah*, the Supreme Court ruled that the Sixth Amendment prohibits law enforcement officers from deliberately eliciting incriminating information from a defendant in the absence of counsel after a

formal charge against the defendant has been filed. *Massiah*, 377 U.S. at 206, 84 S.Ct. at 1203. Accordingly, law enforcement officers violate an accused's Sixth and Fourteenth Amendment rights when, after the right to counsel attaches, they install a radio transmitter in a co-defendant's car and instruct the co-defendant to elicit incriminating statements, *Massiah*, 377 U.S. at 206, 84 S.Ct. at 1203, isolate the accused, agree not to question him and obtain incriminating statements through an appeal to his religious convictions. *Brewer v. Williams*, 430 U.S. 387, 401, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977), instruct a paid informant to develop a relationship of trust and confidence with the accused in jail and secure incriminating information by stimulating conversation, *United States v. Henry*, 447 U.S. 264, 274, 100 S.Ct. 2183, 2189, 65 L.Ed.2d 115 (1980), and equip a co-defendant with a body wire transmitter in order to record a scheduled conversation about the co-defendants' pending charges, their proposed alibis, and their plans for eliminating witnesses. *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 490, 88 L.Ed.2d 481 (1985).

■ In evaluating the conduct of both Chavers and LaTorre we should keep in mind the duty that is imposed upon all citizens to report criminal activity to the appropriate authorities. This duty to advise the law enforcement officials was an established tenet of Anglo-Saxon law at least as early as the 13th century. "'This deeply rooted social obligation is not diminished when the witness ... is involved in illicit activities himself.... [T]he criminal defendant no less than any other citizen is obliged to assist the authorities.'" *Jenkins v. Anderson*, 447 U.S. 231, 243–44 n. 5, 100 S.Ct. 2124, 2132 n. 5, 65 L.Ed.2d 86, 98 n. 5 (1980) (Stevens, J., concurring) (footnote omitted). Courts should be slow to discourage disclosures or to make them useless. Although the Supreme Court, to advance certain constitutional safeguards, has carved out exceptions, to the extent of excluding some disclosures about crime from evidence at trial, we recall that these are, indeed, exceptions and not the rule. Unless evidence of crime is plainly excluda-

ble, it can be allowed. The testimony of Chavers is not plainly excludable.

■ In order to establish a violation of the Sixth Amendment in a jailhouse informant case, the accused must show (1) that a fellow inmate was a government agent; and (2) that the inmate deliberately elicited incriminating statements from the accused. *Henry*, 477 U.S. at 270, 100 S.Ct. at 2186; *see United States v. Taylor*, 800 F.2d 1012, 1015 (10th Cir.1986). Regarding the threshold agency inquiry, no "bright line test for determining whether an individual is a Government agent for purposes of the Sixth Amendment" has emerged. *Taylor*, 800 F.2d at 1015. Nevertheless, other circuits have observed that the creation of an agency depends upon the existence of an agreement between the state and the informant at the time that the elicitation takes place. *See Taylor*, 800 F.2d at 1015; *Thomas v. Cox*, 708 F.2d 132, 136 (4th Cir.), *cert. denied*, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983); *United States v. Metcalfe*, 698 F.2d 877, 882–83 (7th Cir.), *cert. denied*, 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 814 (1983); *United States v. Calder*, 641 F.2d 76, 78–79 (2d Cir.), *cert. denied*, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981). After analyzing the facts and circumstances of this case, the state circuit court and the Florida supreme Court concluded that no agency was created because no agreement had been entered into between LaTorre and Chavers when petitioner made the incriminating remarks.

■ Chavers had no history of acting as a paid informant. Furthermore, the record reflects that LaTorre did not initiate contact with Chavers, solicit Chavers to be a paid informant, encourage the elicitation of incriminating statements, or promise or suggest that Chavers would be compensated or rewarded in the event that Chavers reported incriminating statements to the authorities. LaTorre merely advised Chavers to listen. *See Thomas*, 708 F.2d at 133. LaTorre's statement that he would assist Chavers in obtaining bail was not made until *after* petitioner admitted to Chavers's

involvement in the O'Farrell homicide, and LaTorre's assistance was not conditioned upon further information being obtained. Chavers was not cognizant of the $200 reward offered by the sheriff's department until his release from custody.

We must not confuse speculation about Chavers's motives for assisting the police for evidence that the police promised Chavers consideration for his help or, otherwise, bargained for his active assistance. Chavers's motives alone cannot make him an agent of the police even if the police knew and understood that his motives probably were self-serving and related to getting police cooperation in his own case. After reviewing the record, we find insufficient evidence to rebut the presumption of correctness under 28 U.S.C. sec. 2254(d) applicable to the state court's assessment of the facts and conclude that there is no basis upon which an agency can be established.

Regarding the "deliberately elicited" inquiry, the Supreme Court has recently stated:

the primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. Since 'the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached,' [quoting *Moulton,* 106 S.Ct. at 487 (citation omitted)] a defendant does not make out a violation of [the right to counsel] simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that he *police and their informant* took some action, beyond merely listening,

that was designed deliberately to elicit incriminating remarks.

*Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 2630, 91 L.Ed.2d 364 (1986) (emphasis added); *see United States v. Hicks,* 798 F.2d 446, 449 (11th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 886, 93 L.Ed.2d 839 (1987). When a state trial court has made a factual determination regarding this issue after a hearing on the merits, the trial court's findings are entitled to a presumption of correctness under 28 U.S.C. sec. 2254(d). *Kuhlmann,* 106 S.Ct. at 2630.

■ In this case, the district court applied the presumption of correctness with respect to the state court's findings that Chavers did not stimulate conversation with petitioner. After reviewing the record, the district court found "no basis for concluding that Chavers did anything but listen to Petitioner's voluntary comments." *Lightbourne v. Wainwright,* No. 85–136–Civ–OC–16, slip op. at 9 (M.D.Fla. Aug. 20, 1986). The Sixth and Fourteenth Amendments are not violated when law enforcement officers, either through "luck or happenstance," obtain "spontaneous" and "unsolicited" incriminating statements. *Kuhlmann,* 106 S.Ct. at 2630; *see Hicks,* 798 F.2d at 449. After a plenary review of the record, we find insufficient evidence to rebut the presumption of correctness applicable to the state court determination and conclude that Chavers took no actions to stimulate the incriminating remarks and, more importantly, neither did LaTorre. Accordingly, the district court properly ruled that no agency existed and that petitioner's incriminating statements were not deliberately elicited in violation of *Kuhlmann.*[9]

---

9. The dissent raises several difficult points and reflects a different interpretation of this record and the controlling authorities. Such sometimes happens and is understandable. What is not easily understood is how the admission of these statements, if error, would be harmful with respect to the sentencing phase of petitioner's trial. The dissent finds harmless error as to the guilt phase but suggests such is not so as to sentencing. The aggravating factor under the

Florida statute is sexual battery. While Chavers was the only witness dealing specifically with oral sexual activity, witness Carson covered the same sort of statements including Lightbourne forcing Nancy to engage in multiple sexual acts prior to her murder. To a very large extent the testimony of both was corroborative and repetitious. If there is a Sixth Amendment violation in this case, it is harmless.

### C. *Ineffective Assistance of Counsel*

Petitioner advances several grounds for relief based on violations of the constitutional right to effective assistance of counsel. Specifically, petitioner has identified three acts or omissions on the part of trial counsel which allegedly fell below the threshold level of competence. In order to state a claim of ineffective assistance of counsel sufficient to reverse a conviction or set aside a sentence, a claimant must show that "counsel's performance was seriously deficient and that [the claimant] was prejudiced by the deficiency." *Sinclair v. Wainwright*, 814 F.2d 1516, 1519 (11th Cir. 1987); *see Messer v. Kemp*, 760 F.2d 1080, 1088 (11th Cir.1985), *cert. denied*, 474 U.S. 1088, 106 S.Ct. 864, 88 L.Ed.2d 902 (1986). In order to satisfy the first requirement, a petitioner must convince the court that "in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance." *Harich v. Wainwright*, 813 F.2d 1082, 1088 (11th Cir.1987) (quoting *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984)). When assessing the merits of a defendant's claim, "an attorney's actions are strongly presumed to have fallen within that range, and a court must examine counsel's conduct without the use of judicial hindsight." *Messer*, 760 F.2d at 1088. As this court has acknowledged, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Sinclair*, 814 F.2d at 1519 (quoting *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066). Regarding the second requirement, the defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Harich*, 813 F.2d at 1088; *Matire v. Wainwright*, 811 F.2d 1430, 1435 (11th Cir.1987) (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068).

When challenging the effectiveness of counsel during the guilt/innocence phase, the "defendant must show that, but for the ineffective assistance, the jury would have had a reasonable doubt as to his guilt." *Harich*, 813 F.2d at 1089. When challenging the imposition of capital punishment, a defendant must "show that without the error there is a reasonable probability that 'the balance of aggravating and mitigating circumstances did not warrant death.'" *Messer*, 760 F.2d at 1091 (quoting *Strickland*, 466 U.S. at 695, 104 S.Ct. 2069).

### (1) Conflict of Interest

■ The right to effective assistance of counsel encompasses the right to representation free from actual conflict on the part of defense counsel. *See Cuyler v. Sullivan*, 446 U.S. 335, 349, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980); *Oliver v. Wainwright*, 782 F.2d 1521, 1524 (11th Cir.) *cert. denied*, —— U.S. ——, 107 S.Ct. 313, 93 L.Ed.2d 287 (1986); *Stevenson v. Newsome*, 774 F.2d 1558, 1562 (11th Cir. 1985), *cert. denied*, 475 U.S. 1089, 106 S.Ct. 1476, 89 L.Ed.2d 731 (1986); *Ruffin v. Kemp*, 767 F.2d 748, 750 (11th Cir.1985). Petitioner argues that an actual conflict of interest adversely affected his lawyer's representation.[10] The record reflects that Theophilus Carson was arrested for grand larceny on November 25, 1980. On February 2, 1981, Assistant Public Defender Bradley of the Public Defender's Office for the Fifth Judicial Circuit of Florida was appointed to represent Carson. A preliminary hearing was scheduled for March 2, 1981. On that day, Carson pled guilty to a misdemeanor and the circuit court withheld adjudication and imposed a sentence of time served. Carson was not represented by Bradley subsequent to March 2, 1981. Petitioner's trial commenced on April 20, 1981.

Petitioner was represented by Ron Fox and James Burke, also employed by the Public Defender's Office for the Fifth Judicial Circuit. Petitioner asserts that an actual conflict arose when Carson, a former cellmate of petitioner and a former client of the public defender's office, testified on

---

**10.** Petitioner alleges that an actual conflict of interest existed because Carson, a prosecution witness, was formerly represented by an attorney from the same public defender's office that represented petitioner.

behalf of the state at petitioner's trial. The gist of petitioner's argument is that the "simultaneous representation" of Carson and petitioner by the same public defender's office prevented rigorous cross-examination of Carson in an attempt to impeach his credibility.

Questions involving conflicts of interest are mixed determinations of law and fact. *Oliver*, 782 F.2d at 1524. This issue was not addressed by any state court.[11] The district court rejected petitioner's contentions. After reviewing the record, we find petitioner's alleged constitutional violation based on a conflict of interest untenable as a matter of law and fact.

In order to establish an effective assistance of counsel claim arising from an alleged conflict of interest, a defendant "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Oliver*, 782 F.2d at 1524; *Ruffin*, 767 F.2d at 750 (quoting *Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718); *see Stevenson*, 774 F.2d at 1562. A possible, speculative or merely hypothetical conflict does not suffice. *Cuyler*, 446 U.S. at 350, 100 S.Ct. at 1719; *Oliver*, 782 F.2d at 1525. "[U]ntil a defendant shows that his counsel

actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Cuyler*, 446 U.S. at 350, 100 S.Ct. at 1719. If a defendant can successfully demonstrate the existence of an actual conflict, the defendant must also show that this conflict had an adverse effect upon his lawyer's representation. *Stevenson*, 774 F.2d at 1562; *see Strickland*, 466 U.S. at 692, 104 S.Ct. 2067; *Cuyler*, 446 U.S. at 350, 100 S.Ct. at 1719. Once a defendant satisfies both prongs of the *Cuyler* test, prejudice is presumed and the defendant is entitled to relief. *Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067; *Cuyler*, 446 U.S. at 349–50, 100 S.Ct. at 1719.

Petitioner has articulated a potential conflict of interest. An attorney who cross-examines a former client inherently encounters divided loyalties. *See Porter v. Wainwright*, 805 F.2d 930, 939 (11th Cir. 1986); *Stephens v. United States*, 595 F.2d 1066, 1070 (5th Cir.1979). Whether or not an actual conflict arose when Assistant Public Defender Fox cross-examined a client formerly represented by Assistant Public Defender Bradley presents a substantial question.[12] *See Porter*, 805 F.2d at

---

**11.** We are somewhat troubled by the fact that petitioner has apparently not exhausted this claim in state court. *See Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). Nevertheless, we note that the Supreme Court has ruled that a federal court of appeals may, in its discretion, exercise habeas corpus jurisdiction when the state fails to raise an arguably meritorious defense. *Granberry v. Greer*, —— U.S. ——, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987). In the interests of justice, we will exercise our discretion and address the merits of petitioner's claim.

**12.** At the time of petitioner's trial, the Code of Professional Responsibility governed the standards of ethical conduct in Florida. (The Code was replaced by the Rules of Professional Conduct effective January 1, 1987. *See In re Rules Regulating the Florida Bar*, 494 So.2d 977, 977 (Fla.1986); Fla.Stat.Ann.Bar and Judiciary Rules Chapter 4 (West Supp.1987)). An attorney owes a client the duty to avoid conflicts of interest. *See Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064–65. Under the Code, an attorney has an obligation to preserve the confidences and secrets of former clients. *See EC 4–6.* DR 5–105 states in pertinent part: "[a] lawyer shall

not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client ... if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure...." The Florida Supreme Court has acknowledged that a public defender's office can constitute a "law firm" within the meaning of Canon 5. *See State v. Fitzpatrick*, 464 So.2d 1185, 1186 (Fla.1985). Thus, a conflict may arise when a public defender's office represents clients with adverse interests. When a public defender determines that a conflict of interest exists, the public defender is bound to report the conflict to the court so that independent counsel can be appointed. Fla.Stat.Ann. § 27.53(3) (West 1974). Of course, what constitutes a conflict of interests as a matter of legal ethics or as a matter of state law and what constitutes a conflict of interests for federal constitutional questions may differ. In this case, the record does not reflect that any conflict was reported to the court. The Supreme Court has acknowledged that attorneys are in the best position to determine when a conflict of interest exists. *See Cuyler*, 446 U.S. at 347, 100 S.Ct. at 1717.

939. Due in part to the fact that petitioner did not raise this issue or request an evidentiary hearing pertaining to a potential conflict of interest prior to filing a Petitioner for Writ of Habeas Corpus in district court, the record is inconclusive. Nevertheless, we hold that even if an actual conflict existed, petitioner has failed to allege such facts which, if proven, would demonstrate that the alleged conflict adversely affected petitioner's representation.

The record reflects that Carson testified during direct examination that he was incarcerated for accessory to grand theft and that he was released because of a deal worked out with the state. During an extensive cross-examination, counsel for petitioner questioned Carson about his relationship with petitioner, contradictions in the sequence of events, potential independent sources of knowledge of the O'Farrell homicide, Carson's use of an alias, and the lack of specifics with regard to petitioner's alleged statements, including what was taken, where the gun came from, and how the events transpired. In addition, counsel for petitioner thoroughly inquired about the details of Carson's plea agreement and elicited the facts that Carson pled *nolo contendere* to the charges and received a sentence of time served consisting of approximately 100 days. Given this testimony, we discern no adverse effect upon petitioner's representation. Counsel for petitioner fully and fairly cross-examined Carson with respect to his "deal" with the state in order to show the possibility of bias or prejudice. In addition, petitioner's counsel attempted to impeach Carson's credibility through a variety of methods. Any conflict of interest which may have existed by virtue of the fact that Assistant Public Defender Fox happened to cross-examine a client formerly represented by the same public defender's office had, at best, a *de minimus* effect upon petitioner's representation. Accordingly, we find no merit to petitioner's claim that an actual conflict adversely affected petitioner's assistance of counsel.

### (2) Failure to Investigate

Petitioner contends that his sentencing was improper and that the state should be required to do it again. *See Hitchcock v. Dugger,* —— U.S. ——, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). Specifically, petitioner alleges that trial counsel was ineffective by the failure to adequately investigate petitioner's background and offer additional evidence of mitigating circumstances at the sentencing phase. The record reveals that petitioner was called as a witness and testified about his age, his citizenship, his lack of a significant criminal record, his education and his children. Petitioner asserts that counsel could have, but failed to present evidence of other mitigating circumstances through the testimony of petitioner's friends and family. In support of this contention, petitioner has offered the affidavits of twenty-seven relatives and acquaintances. According to the affiants, petitioner was one of ten illegitimate children raised in a very modest environment. Despite the fact that petitioner was allegedly subjected to severe physical and psychological abuse by an older brother, petitioner was perceived as a happy, well-behaved and popular person. Regardless of the economic hardships and social disadvantages associated with his home environment, petitioner was purported to be a good student, an excellent athlete and a devoted Catholic. Petitioner alleges that had the judge and jury been apprised of these facts, a reasonable probability exists that the result of the sentencing proceeding would have been different.

The Florida Supreme Court rejected petitioner's argument. In the words of that court:

[c]ounsel was not ineffective for failing to present mitigating evidence at sentencing. The trial record clearly indicates that the sentencing judge was in fact aware of many of the mitigating factors that counsel on appeal is now presenting to the Court. The lower court was fully aware of the fact that [petitioner] was raised in a 'lower socioeconomic home environment,' his educational history and religious background. The additional mitigating factors now presented to the Court are

merely cumulative, now [sic] new. Thus our finding on direct appeal that the strength of the aggravating factors warrant the death sentence is still valid.

*Lightbourne,* 471 So.2d at 28. The district court concurred. *Lightbourne,* No. 85–136–Civ–OC–16 slip op. at 20–21.

Petitioner's allegations and proffered evidence are inadequate to overcome the strong presumption that the challenged action might be considered sound trial strategy and falls within the wide range of reasonable professional assistance. *Strickland v. Washington,* [466 U.S. 668] 104 S.Ct. 2052, 2066 [80 L.Ed.2d 674] (1984). Given the circumstances of this case, counsel's decision to focus on Petitioner's lack of a significant criminal record and to argue against the wisdom of the death penalty was a reasonable one. 'It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.' *Id.* [104 S.Ct.] at 2065.

Most of the evidence that Petitioner claims his counsel should have obtained and introduced at the sentencing phase was considered by the trial judge before Petitioner was sentenced. The presentence investigation report revealed that Petitioner was an illegitimate son, born and raised in a lower socioeconomic home environment, who had almost no relationship with his father because his father separated from the family when Petitioner was a small child. The comprehensive report also set forth Petitioner's marital and family status, educational background, religious affiliation, interest in riding horses, and employment history. Although the report did not reflect that Petitioner's friends and neighbors described him as a loving, non-violent individual, it did indicate that Petitioner lacked a significant record of prior criminal activity. Essentially, the only evidence now proffered by Petitioner that was not considered by the trial judge at sentencing is the testimony of family and friends regarding Petitioner's physical abuse by his older brother and Petitioner's apparent compassionate character.

*Lightbourne,* No. 85–136–Civ–OC–16, slip op. at 20–21.

A criminal defendant who is charged with a capital offense has the right to present virtually any evidence in mitigation at the penalty phase. *See Hitchcock,* — U.S. at ——, 107 S.Ct. at 1824; *Peek v. Kemp,* 784 F.2d 1479, 1488 (11th Cir.) (en banc), *cert. denied,* — U.S. ——, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986). Nevertheless, "[c]ounsel has no absolute duty to present mitigating character evidence." *Mitchell v. Kemp,* 762 F.2d 886, 889 (11th Cir.1985). In order to determine what evidence might be appropriate, defense counsel has the duty to conduct a reasonable investigation. *Thompson v. Wainwright,* 787 F.2d 1447, 1450 (11th Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1986). The failure to conduct any investigation of a defendant's background may fall outside the scope of reasonable professional assistance. *Thompson,* 787 F.2d at 1452. After a sufficient investigation, however, "counsel may make a reasonable strategic judgment to present less than all possible available evidence in mitigation." *Mitchell,* 762 F.2d at 889 (quoting *Stanley v. Zant,* 697 F.2d 955, 965 (11th Cir.1983), *cert. denied, sub nom.* 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984)). A lawyer's election not to present mitigating evidence is a tactical choice accorded a strong presumption of correctness which is "virtually unchallengeable." *Sinclair,* 814 F.2d at 1519 (quoting *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066); *see e.g., Darden v. Wainwright,* 477 U.S. 187, 106 S.Ct. 2464, 2474, 91 L.Ed.2d 144 (1986); *Porter,* 805 F.2d at 935; *Tafero v. Wainwright,* 796 F.2d 1314, 1320 (11th Cir.1986); *Dobbs v. Kemp,* 790 F.2d 1499, 1514 (11th Cir.1986), *modified on other grounds,* 809 F.2d 750 (1987); *Funchess v. Wainwright,* 772 F.2d 683, 690 (11th Cir.1985), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1242, 89 L.Ed.2d 349 (1986). This court has specifically ruled that counsel's decision to rely on the defendant's testimony rather than offering the testimony of

the defendant's family members to show a "turbulent family history" may be a reasonable strategic choice under the circumstances. *Tucker v. Kemp*, 776 F.2d 1487, 1491 (11th Cir.1985), *cert. denied*, — U.S. ——, 106 S.Ct. 3340, 92 L.Ed.2d 743 (1986); *see Mulligan v. Kemp*, 771 F.2d 1436, 1444 (11th Cir.1985).

▮ Petitioner argues that trial counsel's representation fell below an objective standard of reasonableness because counsel allegedly failed to conduct *any* investigation with respect to petitioner's background. After an impartial but critical review of the record, we find petitioner's characterization of counsel's efforts clearly erroneous. It is evident that an investigation was conducted and that counsel thereafter elected to put petitioner on the stand. Although no deficiencies with respect to petitioner's background check are readily apparent, the reasonableness of counsel's investigation is difficult to assess because the specifics of counsel's efforts have not been delineated for the record. Nevertheless, even if petitioner's counsel did not conduct an adequate investigation, we conclude that petitioner has not demonstrated sufficient prejudice which resulted from this alleged deficiency.

As indicated, a defendant challenging the propriety of a death sentence must show that in the absence of counsel's alleged inadequate performance, a reasonable probability exists that the "balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2069. Here, the trial judge found the existence of two mitigating [13] and five aggravating [14] circumstances. The record reveals that the trial court was aware of a substantial amount of information which petitioner claims his counsel failed to discover and introduce during the sentencing phase.[15] Even if the information supplied by the affiants is not merely cumulative, we find that any mitigating effect does not begin to tip the balance of aggravating and mitigating factors in favor of petitioner. Petitioner has simply failed to show that counsel's performance was so deficient during the sentencing phase that this court cannot rely on the result as being just.

### (3) Failure to Object to Inflammatory Statements

When challenging the denial of post-conviction relief in state court, petitioner argued that the trial judge improperly considered prejudicial hearsay statements and accusations relating to non-statutory aggravating circumstances during the sentencing phase. The record reflects that following the guilt/innocence phase of the trial, the court ordered a presentence investigation (PSI). A PSI report, completed on April 30, 1981, provided information relating to the circumstances of the offense, petitioner's alibi, and personal information, including petitioner's criminal record, social history, marital status, education, religion, interests, activities, health and employment. In addition, a "confidential evaluation" was prepared by the Department of Corrections containing personal statements by several of Miss O'Farrell's relatives and petitioner's sister. The O'Farrell family generally expressed the opinion that petitioner was remorseless, beyond rehabilitation, and deserving of the death penalty. Petitioner alleged that the consideration of these inflammatory statements prejudiced

---

**13.** The trial judge found that petitioner had no significant history of prior criminal activity, *see* Fla.Stat.Ann. § 921.141(6)(a) (West 1985) and that petitioner was only twenty-one years of age. *See* Fla.Stat.Ann. § 921.141(6)(g).

**14.** The trial judge found beyond a reasonable doubt that a capital felony was committed while petitioner was engaged in burglary and sexual battery, Fla.Stat.Ann. § 921.141(5)(d), that the capital felony was committed for the purpose of avoiding lawful arrest, Fla.Stat.Ann. § 921.141(5)(e), that the capital felony was committed

for pecuniary gain, Fla.Stat.Ann. § 921.141(5)(f), that the capital felony was especially heinous, atrocious, or cruel, Fla.Stat.Ann. § 921.141(5)(h), and that the capital felony was a homicide committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification. Fla.Stat.Ann. § 921.141(5)(i).

**15.** This information was contained in a presentence investigation report which was considered by the judge.

his sentencing. The Florida Supreme Court ruled that petitioner's claim was foreclosed from collateral review because it was not raised on direct appeal. *Lightbourne*, 471 So.2d at 28.

█ Thereafter, in his Petition for Writ of Habeas Corpus, petitioner recast the claim as an error by trial counsel in failing to object to the trial judge's consideration of the statements in the PSI report. The jury had no access to the report. The district court assumed that federal review of the claim was not precluded when couched in terms of ineffective assistance of counsel. Nevertheless, the district court found petitioner's contention meritless because of the absence of a reasonable probability that any deficiency on the part of counsel in failing to object to judicial consideration of the inflammatory statements adversely affected the outcome of petitioner's sentencing. *Lightbourne*, No. 85–136–Civ–OC–16, slip op. at 22. We agree.

█ Federal law places few limitations upon the information which a trial judge may consider before determining an appropriate sentence.[16] *United States v. Rodriguez*, 765 F.2d 1546, 1554–55 (11th Cir. 1985). At least one Florida court has ruled that it is within a trial judge's discretion to consider statements by relatives of the deceased victim. *See Howard v. State*, 473 So.2d 10, 11 (Fla.3d DCA 1985). In addition, hearsay testimony may be considered during sentencing so long as the objectionable testimony does not serve as the basis for the sentence. *See Rodriguez*, 765 F.2d at 1555. Here, although the trial judge was admittedly aware of the sentiments of the O'Farrell family, the record unequivocally shows that the sentence was based on the recommendation of the jury and the overriding weight of the statutorily authorized aggravating circumstances. Thus, even if counsel's conduct fell below an "objective standard of reasonableness" by failing to object to the statements in question, petitioner has unsuccessfully demonstrated a reasonable probability that the alleged deficiency prejudiced petitioner's sentence. *Strickland*, 466 U.S. at 688, 694, 104 S.Ct. at 2064, 2068.

### CONCLUSION

For the foregoing reasons, the decision of the district court is AFFIRMED.

ANDERSON, Circuit Judge, concurring in part and dissenting in part:

I concur in all of the opinion for the court except Part II.B., with regard to the jailhouse informant, Chavers. With respect to that issue, I respectfully dissent. In my judgment, the line of cases beginning with *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and, in particular, *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), require reversal in this case.

In *Massiah*, the Supreme Court held that the Sixth Amendment prohibits law enforcement officers from deliberately eliciting incriminating information from a defendant in the absence of counsel after formal charges have been lodged against him. In *Henry*, the Supreme Court applied the *Massiah* principle to a situation very similar to that in the instant case. While Henry was in jail, a fellow inmate engaged him in more than incidental conversation about Henry's crime and as a result Henry made incriminating statements. The in-

---

**16.** We note that the Supreme Court recently ruled in *Booth v. Maryland*, ⸺ U.S. ⸺, 107 S.Ct. 2529, 96 L.Ed.2d 440 (U.S.1987) that a Maryland statute requiring a court or jury to consider a "victim impact statement" when the death penalty is requested violated the Eighth Amendment. Pursuant to Maryland law, Booth elected to have his sentence determined by a jury instead of a judge. *Booth*, ⸺ U.S. at ⸺, 107 S.Ct. at 2529. The Court ruled that the victim impact statement describing the effect of the crime on the victim's family was irrelevant and unduly inflammatory and created a risk of arbitrary and capricious action. *Id.*, at ⸺, 107 S.Ct. at 2535–36. We do not believe that *Booth* is applicable here because the death sentence imposed by the Florida circuit court was based on the recommendation by the jury. As indicated, only the judge had access to the PSI and the allegedly inflammatory statements. The judge adopted the jury's recommendation relying solely on the weight of the statutorily authorized aggravating circumstances. Accordingly, we discern no prejudice with respect to petitioner's sentencing.

mate-informant had for at least a year been paid when he produced information. After learning of the informant's access to Henry in the jail, the Federal Bureau of Investigation agent told him not to question Henry or initiate any conversations with Henry, but to be alert to any statements made by Henry. The Court implicitly held that the inmate-informant's activities—i.e., deliberately eliciting statements from Henry—were attributable to the government. The inmate-informant was more than a mere passive listener, and the Court concluded that he had "deliberately elicited" the incriminating statements in violation of *Massiah*. Although the FBI agent did not intend for the informant to take affirmative steps to secure incriminating information, the Court expressly held that the FBI agent must have known the likelihood thereof, and that this violated the "deliberately elicit" test.

When the affirmative actions designed to elicit incriminating statements were performed by another inmate, as in this case and in *Henry*, the agency status of that inmate-informant is a necessary prerequisite for a *Henry* claim. Unless the informant's actions are attributable to the state, then there has been no deliberate elicitation by the state. There are two prongs of a *Henry* claim, and each must be satisfied for a defendant to prevail: (1) the informant's actions must be attributable to the state; and (2) the informant must be more than just a passive listener—he must "deliberately elicit" the incriminating information from the defendant. *Henry*, 447 U.S. at 269–72, 100 S.Ct. at 2186–88; *United States v. Taylor*, 800 F.2d 1012, 1015 (10th Cir.1986); *United States v. Geittmann*, 733 F.2d 1419, 1427 (10th Cir.1984). I refer to the former as the "agency" prong and the latter as the "deliberately elicit" prong. The ultimate issue is whether what has happened is the functional equivalent of interrogation by the government. Unless the agency prong is met, the informant's activities are not attributable to the government. On the other hand, if the acts of the informant are attributable to the government, then the question becomes whether the informant has "deliberately elicited" the incriminating statements.

Addressing first the agency prong, the relevant facts disclosed in the record are as follows: (1) Theodore Chavers, the fellow inmate, made the initial contact with Investigator LaTorre by telephone and let LaTorre know that he was in a position to get information from Lightbourne; (2) LaTorre testified that he understood that Chavers' telephone call to him meant that Chavers was trying to give him some information and that Chavers would later come back to him and seek his help talking to the judge or getting out of jail; (3) LaTorre told Chavers to "keep his ears open" to anything that Lightbourne might say; (4) Chavers met with LaTorre on two occasions after the initial telephone call, and at the first of these meetings asked LaTorre about assistance in getting bail, and LaTorre told Chavers that he would talk to the judge about getting him bail; (5) Chavers subsequently had a third meeting with LaTorre and gave him more information; (6) as a result of the information he provided, Chavers ultimately received a $200 reward and an early release from jail; and (7) LaTorre had previously received information from Chavers in connection with another case.

Because the facts with respect to agency as disclosed in the record are at variance with some facts apparently found by the state courts, it is necessary to consider the presumption of correctness to which state fact findings are entitled. 28 U.S.C. § 2254(d). The Florida Supreme Court[1] addressed only the agency prong and made the following findings:

> In the instant case there is nothing in the record establishing that the informant Chavers had any prearranged guarantee of money in return for information, and it appears that the two hundred dollars that he did receive from the Marion County Sheriff's Department was drawn

---

**1.** The state trial court denied the relevant motion to suppress without opinion. However, because the prosecutor's argument to the court focused on the agency issue, I would assume that the state trial court made an implicit finding that Chavers was not an agent.

from a general reward fund and not given as an inducement to elicit information.

. . . . .

Without some promise or guarantee of compensation, some overt scheme in which the state took part, or some other evidence of prearrangement aimed at discovering incriminating information we are unwilling to elevate the state's actions in this case to an agency relationship with the informant Chavers.

*Lightbourne v. State*, 438 So.2d 380, 386. Summarizing, the Florida Supreme Court made three findings. First, that there was no prearranged promise of the $200 reward or other compensation; second, that there was no overt scheme in which the state took part; and third, that there was no other evidence of prearrangement. All three are findings of subsidiary facts to which the presumption applies, unless one of the exceptions operates. The first finding—that there was no prearranged promise of the $200 reward or other compensation—is fully supported in the record. There is ample testimony that the $200 reward was not mentioned until after Chavers had elicited and provided all of the information. Similarly, the second finding

is supported in the record. However, I am persuaded that the third finding is not fairly supported in the record as a whole.

Investigator LaTorre testified that he understood that Chavers was calling him with a view to getting out of jail, and that LaTorre figured that Chavers was trying to provide information and would be coming back to seek LaTorre's assistance in talking to the judge to get him out of jail.[2]

Also, LaTorre testified that he had three contacts with Chavers. The first was on Sunday night, February 1, 1981, when Chavers initiated a telephone conversation in which he told LaTorre that he was in a cell with Lightbourne and gave LaTorre some preliminary information that Lightbourne had revealed.[3] The second contact was the next day, February 2, 1981.[4] La-Torre went to the jail, talked with Chavers, and took a taped statement from Chavers as to what Lightbourne had said. After taking the statement at this second contact, Chavers asked LaTorre to help get him out of jail, and LaTorre said he would talk to the judge to see if he could help get bail for Chavers.[5] The third contact occurred several days later, and Chavers provided addi-

---

**2.** The relevant portions of the question and La-Torre's answer are as follows:

Question: Did Theodore Chavers indicate to you why he was calling you, what motivated him to call you and supply you with this information?

Answer: Well, Theodore Chavers, from what I understand or understood at that time, would call anybody to get out of jail, and I figured that he was trying to give me some information; if it meant anything, that he was later going to come back and say that I should talk to the judge or something to get him out of jail.

Deposition of LaTorre, March 25, 1981, Supplement to Appendix—Vol. II at 393–94.

**3.** *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 486–87, 88 L.Ed.2d 481 (1985), indicates that it is not significant that Chavers initially approached LaTorre rather than vice versa.

**4.** According to undisputed facts in the record, this statement was given on Feb. 2, 1981. However, the transcript of the statement in the record is dated Feb. 3, 1981. For purposes of consistency, I will henceforth refer to this statement as the Feb. 2, 1981 statement.

**5.** The relevant questions and LaTorre's answers are as follows:

Question: At the statement where bail was discussed, was the matter of bail discussed before or after Theodore Chavers had given you a statement about the defendant?

Answer: OK, I'm trying to say that when I obtained the first taped statement—

Question: Which would have been—

Answer: On February 2.

Question: When you came back on February 2?

Answer: Right.

Question: All right.

Answer: Then I would anticipate or believe that the discussion was—after the statement was taken, he goes into an act, which he uses, you know, "you have got to help me out. I have got to get out of here"; and I said, "Well, I will talk to the judge. I will see what your charges are, see if we can get bail"; and then that may have been discussed when he came in the third time I had contact with him and took the second statement; we may have talked about it prior to him giving the statement or afterwards, but I don't really remember. It wasn't discussed within the statement.

LaTorre's testimony at Suppression Hearing, April 9, 1981, Appendix—Vol. I, Tab F at 23–24.

tional information. They may or may not have discussed the bail matter again. A taped statement was also taken at this third meeting which appears in the record as having been taken on February 12, 1981.[6]

Thus, LaTorre's testimony establishes that there *was* a "prearrangement" with Chavers, and the state court's finding to the contrary is not fairly supported by the record as a whole.[7]

Putting aside the foregoing state finding which has no support in the record, the subsidiary facts relevant to the agency prong are clear. LaTorre understood that Chavers was providing information with the hope or expectation of some consideration with respect to his own charges. Midway through his dealings with Chavers,

this implicit arrangement became explicit; LaTorre represented that he would help him get bail.[8] In addition, LaTorre told Chavers to "keep his ears open" to anything Lightbourne might say. LaTorre had previously received similar information from Chavers. And finally, LaTorre did intercede on behalf of Chavers and Chavers was in fact released as a result of the information he provided.

I conclude that these facts satisfy the agency prong of the *Henry* claim, such that the actions of Chavers are attributable to the state.[9] Chavers was operating pursuant to instructions from the state to listen to Lightbourne. LaTorre understood Chavers' expectation of benefit, and that understanding later became explicit when LaTorre said he would talk to the judge in an effort to get Chavers released on bail.[10]

---

**6.** It is not clear exactly when this second statement was made. The transcript of the interview states that the interview was conducted on February 12, 1981. However, testimony at pre-trial hearings and at trial established that Chavers was released from jail on February 10, 1981 and *that he gave the second statement while he was still in custody.* Though the actual date of the second statement is therefore unclear, it is clear that it occurred at least several days after the first taped statement. Further precision is not relevant in this case. For purposes of ease of reference, I will henceforth call this second interview the Feb. 12, 1981 statement.

**7.** There is no suggestion that LaTorre's testimony was discredited. In fact, LaTorre's testimony was the only possible basis for any finding.

**8.** The majority notes that LaTorre's statement to Chavers that he would assist him in getting bail did not come until after Lightbourne had already admitted his involvement to Chavers. Reliance upon this fact overlooks two important points. First, LaTorre testified that he understood from the beginning that Chavers was trying to provide information in hopes of some such assistance. The bail talk at the February 2 meeting merely made that implicit arrangement explicit. Second, very significant information was elicited from Lightbourne after the explicit arrangement, including all of the details of the crime and all of the details of the sexual assault.

**9.** This conclusion is also supported by an examination of the facts in cases where an agency relationship was *not* found. The facts in Lightbourne's case are more favorable to the petitioner than those in *Thomas v. Cox,* 708 F.2d 132, 135 (4th Cir.), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983). In *Thomas,* no agency relationship was found where: (1) the

informant was "motivated by conscience" in initiating contact with the defendant and in offering assistance to the government; (2) the informant had made no prior arrangement with the government to procure information; and (3) the informant had "nothing to gain" from his actions since he had been promised no reward, had no reason to expect any, and had already been released from prison. Obviously, Chavers' relationship with the government differed significantly in each of these respects. *See also United States v. Hicks,* 798 F.2d 446, 448-49 (11th Cir.1986) (finding no agency where cellmate fortuitously reported defendant's incriminating statement to the government, and where there had been no government creation or exploitation of an opportunity to get information from the defendant), *cert. denied,* — U.S. —, 107 S.Ct. 886, 93 L.Ed.2d 839 (1987); *United States v. Metcalfe,* 698 F.2d 877, 882-83 (7th Cir.) (finding no agency where no contact between FBI and informant existed prior to informant's relating of incriminating statements and where there was no reward or expectation of a reward), *cert. denied,* 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 814 (1983); *United States v. Taylor,* 800 F.2d 1012, 1015 (10th Cir.1986) (finding no agency where informant had only expectations of a reward and received none, and where informant received no instructions or directions by the government, despite fact that FBI placed informant in defendant's cell). *See also United States v. Surridge,* 687 F.2d 250 (8th Cir.), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 465, 74 L.Ed.2d 614 (1982); *United States v. Malik,* 680 F.2d 1162 (7th Cir.1982).

**10.** Because the contrary finding would not have fair support in the record as a whole, I need not decide whether the ultimate agency issue, i.e., whether Chavers' actions are attributable to the

Having. concluded that Chavers' actions are attributable to the state, I must next address whether his actions satisfy the "deliberately elicit" prong of the *Henry* claim. The district court purported to defer to a presumption in favor of "the Florida Supreme Court's factual finding that the state and Chavers did not stimulate conversation with Petitioner or otherwise attempt to deliberately elicit incriminating statements from him...." *Lightbourne v. Wainwright*, No. 85–136–Civ–OC–16, slip op. at 9 (M.D.Fla. Aug. 20, 1986). This was accepted by the majority. I respectfully disagree on three grounds.

First, my reading of the Florida Supreme Court opinion persuades me that that court made no such finding. The language which the district court considered to be a

fact finding was actually merely language describing the Supreme Court decision in *United States v. Henry*.[11] Also, the focus of the opinion of the Supreme Court of Florida was on the agency prong, and not on the "deliberately elicit" prong. The issue was stated: "The threshold inquiry here is whether or not Theodore Chavers was acting as an agent of the state." *Lightbourne v. State*, 438 So.2d at 386. After describing the *Massiah* case and the *Henry* case, the Florida Supreme Court turned its analysis to the instant case with the language which I have quoted above at 1028. That language focuses on the absence of a prearranged guarantee of the $200 reward or other compensation, the absence of an overt scheme, and the absence of other evidence of prearrangement.

---

state, is a question of pure fact or a mixed question of fact and law to which the § 2254(d) presumption does not apply. The Eighth Circuit has held that this ultimate issue is a legal question. *United States v. Surridge*, 687 F.2d 250, 252 (8th Cir.), *cert. denied*, 459 U.S. 1044, 103 S.Ct. 465, 74 L.Ed.2d 614 (1982). ("We agree that the determination as to the relationship or understanding between the police and the informant is a factual determination. However, beyond this factual determination there is a legal question: whether the relationship or understanding as found by the district court is such that the informant's questioning has to be considered government interrogation for constitutional examination.") The Eighth Circuit's conclusion finds some support in *DeAngelo v. Wainwright*, 781 F.2d 1516 (11th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 444, 93 L.Ed.2d 392 (1986). Similarly, in *Thomas v. Cox*, 708 F.2d 132 (4th Cir.1983), the Fourth Circuit applied the presumption of correctness to subsidiary facts, *id.* at 135, but seemed to make an independent determination on the ultimate agency issue, recognizing that it was not subject to any bright line test, and that the degree of prearrangement would determine the issue, *id.* at 136–37. The Eighth Circuit's conclusion is also supported by analogy from Supreme Court precedent, discussed in text below, which suggests that the ultimate determination on the "deliberately elicit" prong is a mixed question of fact and law.

Although the Third Circuit in *United States v. Van Scoy*, 654 F.2d 257, 260–61 (3d Cir.), *cert. denied*, 454 U.S. 1126, 102 S.Ct. 977, 71 L.Ed.2d 114 (1981), labeled the agency issue a question of fact and applied the clearly erroneous standard, the subsidiary facts there mandated that conclusion. To the same effect, see *United States v. Malik*, 680 F.2d 1162, 1165 (7th Cir. 1982).

11. In context, the language which was taken to be a finding reads as follows:

In *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), the Supreme Court applied *Massiah* in the context of using informant information and apparently recognized an active/passive dichotomy in determining whether or not an informant is to be deemed acting as an agent of the state in any particular case. The key to the *Henry* decision lies in the requirement that in order for an informant to be acting as a state agent he must, acting in concert with the state, actively stimulate or instigate conversation specifically designed to elicit incriminating information. If no active role is taken by the informant, but rather he merely remains passive and keeps his ears open for anything the defendant might wish to volunteer, then under the *Henry* analysis there is no agency relationship which would trigger the fifth and sixth amendment protections.

In *Henry*, the Court found that the informant, Nichols, was acting under instructions as a paid informant for the government. In return for information he was given money and this arrangement was mutually understood. In the instant case there is nothing in the record establishing that the informant Chavers had any prearranged guarantee of money in return for information, and it appears that the two hundred dollars that he did receive from the Marion County Sheriff's Department was drawn from a general reward fund and not given as an inducement to elicit information.

*Lightbourne v. State*, 438 So.2d 380, 386 (Fla. 1983). Nowhere does the court hold that *in this case* the informant played a passive role. Thus, I can only conclude that the district court erroneously gave deference to what it mistook to be a factual finding.

All of those findings related to the agency prong, and are discussed above. The only reference to the facts of this case in the context of the "deliberately elicit" prong was: "Similarly, Investigator LaTorre's advice to the informant Chavers to keep his ears open does not constitute an attempt by the state to deliberately elicit incriminating statements." *Id.* at 386. That sentence focuses on what *LaTorre* was attempting to do. Contrary to the district court's suggestion, the Florida Supreme Court made no reference to whether Chavers himself stimulated conversation, and certainly made no fact finding in that regard.[12]

Second, even if the state court had made such a fact finding, such a finding would not have been fairly supported in the record as a whole. The record reveals overwhelming evidence that Chavers did "take affirmative steps to secure incriminating information...." *Henry*, 447 U.S. at 271, 100 S.Ct. at 2187. Chavers questioned Lightbourne repeatedly with the express purpose of eliciting information about the crime and his participation in it. On one occasion, Chavers described his activities as similar to a lawyer cross-examining Lightbourne.[13] On another occasion, Chavers described himself and another inmate as acting like a detective, coming up with clues.[14] The following examples should suffice to demonstrate the strength of the evidence

that Chavers did deliberately elicit incriminating information from Lightbourne.

—During Chavers' descriptions of the conversations at trial, Chavers stated that Lightbourne was acting like he was worried about something and Chavers said: "[S]o I said well, man, something wrong, man. You know, you can talk to me about it. I said, you must—you must be did do what they say you done, I say, because you seem like you worried about it." Appendix—Volume III at 1110.

—Describing the same encounter in his second taped statement to LaTorre, dated Feb. 12, 1981, Chavers said: "I said, 'Man, you got somethin on your conscience, something botherin you, man', I said, 'You done something wrong, man that is botherin you now?' He say, 'No, I'm scared to talk'. I say, 'Whatcha mean ..'" Supplement to Appendix—Volume II at 348.

—During his first statement to Investigator LaTorre, dated Feb. 2, 1981, Chavers described his conversations with Lightbourne: "[H]e went to tell me about the security guard be there. So, I said, 'Well, there's a security guard,' and he said, 'Yeh.' And I say, 'Man, you mean to tell me the security guard ain't; if this lady was to the house, he didn't miss her, man, from not seeing her, knowing that she wasn't in Miami or nothin like that'. He say, 'I don't know,

12. This reading of the Florida Supreme Court opinion is not only clear from the text of the opinion itself, but it is also consistent with the fact that the prosecutor in the trial court also focused on the agency prong, rather than the "deliberately elicit" prong. Of course, this approach by the prosecutor, and by the Florida Supreme Court, is entirely appropriate. If Chavers were not an agent of the state, then his actions would not be attributable to the state, and his actions therefore would be irrelevant.

13. In the first taped statement given to Investigator LaTorre, dated February 3, 1981, Chavers said:

He said that ah, he was telling me about, to check this out man, he said, "These fuckin cops don't have nothing, man." I say, "Well, they don't." He say, "No." He say like, "They went in the house, they didn't get no fingerprints, they didn't get no nothin." So we went on you, you know, in other words I just

played, you know, like I was a lawyer or something. I say, "Where was the lady at?" He say, "It was in the bed."
Supplement to Appendix—Vol. II at 343.

14. In the second taped statement given to Investigator LaTorre, dated February 12, 1981, Chavers said:

Yeh. I told him he was sick, man. He told more than me, he told Richard Carnegie and he told Larry Emmanuel, the guys I told you to talk to. Larry was the first one when I got in there, he told me and Larry. Larry was the first one, cause I told Larry; I say, "Larry", "Try to help me put this thing together?" "You think this dude here raped that lady man?" You know me and him went on and me and him started coming up with clues, about the bullet that shot the lady, you could tell where the bullet was fired out of the gun and everything, see, the gun that he got caught with.
Supplement to Appendix—Vol. II at 351.

man'. I say, 'This sure funny, man, look like he would heard or somethin'.'" Supplement to Appendix—Volume II at 344.

—During his second statement to Investigator LaTorre dated February 12, 1981, Chavers further described his conversations with Lightbourne: "I asked him, I say, 'Man, what you think, them people gonna run an autopsy and find out everything that happened?' I say, 'You think they gonna have a bullet test on that gun and find out that's the gun that shot the lady?' I say, 'If so, man, you should try to say something?' 'If that's not the gun that killed the lady, you should tell em who you got it from. I said, 'Or you'll be in a world of trouble, man, 'I'm serious, man.' And, I tried to really reason. I tried to have him state it for when you came down here that he would be willing to talk to you about it, but you know just not every day somebody would step up and say that they murdered somebody." Supplement to Appendix—Volume II at 349.

—After Chavers had reported to LaTorre, and LaTorre had interviewed Lightbourne, Chavers described Lightbourne coming back to the cell after his interview with LaTorre: "And so when he came back in the cell, he told me, say that they think he he the one killed the lady and they was going to charge him with the charge because they said the bullet came out of the same gun that he had, and I said, well, if the bullet didn't come out there, you don't have nothing to worry about. I say, if that ain't the gun that killed her, you don't have nothing to worry about, and he started acting real nervous and everything. He said, well, I don't know, man, you know. He said, it might be the gun. I said, well, if it's the gun, Lightbourne, you should tell the people what you know about it to clear yourself out of it. I say, as far as it stand right now, you killed her, man." Appendix—Volume III at 1110.

—Recalling at trial what Lightbourne told him about the crime itself, Chavers said: "He told me about—he told her that he wasn't going to hurt her, and he performed sex acts with her, and he also told me about—you know, well, after Mr. LaTorre done formally charged him that afternoon and took his picture and fingerprinted him, he came back in the cell and made a statement as Ms. O'Farrell having big vagina. So I asked him how would you know that Ms. O'Farrell had a big vagina, not unlessen you had intercourse with her." Id. at 1115.

After a careful review of the record, it is abundantly clear that Chavers repeatedly questioned Lightbourne for the express purpose of eliciting from him the details of the crime and his participation in it.[15] Any finding to the contrary would not be fairly supported in the record as a whole.

Finally, I disagree with the district court's holding that the ultimate determination of "deliberate elicitation" is a pure question of fact entitled to the § 2254(d) presumption.[16] *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), makes it clear that the issue of whether the informant asked any questions is a subsidiary issue of fact to which federal courts owe deference. The Supreme Court held that the court of appeals erred in giving a "description of Lee's [the informant's] interaction with respondent that is completely at odds with the facts found by the trial court. In the Court of Appeals'

---

**15.** Since the record amply demonstrates that Chavers took a very active role in eliciting information from the defendant, the *Kuhlmann v. Wilson* example of a "listening post" informant is inapposite to this case. *Kuhlmann* posed a situation where there were *no conversations:* the court found that the informant "at no time asked any questions" of the defendant, and that he "only listened" to the defendant's "spontaneous" and "unsolicited" statements. *Kuhlmann,* 477 U.S. at ——, 106 S.Ct. at 2630. Upon those facts, which were presumed to be correct since they were subsidiary factual findings, the only possible legal conclusion was that there was no deliberate elicitation. By contrast, the facts of the instant case are very different.

**16.** In light of my conclusion that this record cannot support any finding other than that Chavers deliberately elicited incriminating information from Lightbourne, my conclusion that the ultimate determination on "deliberate elicitation" is a mixed question of fact and law is technically unnecessary to my resolution of this case.

view, 'Subtly and slowly, but surely, Lee's ongoing verbal intercourse with [respondent] served to exacerbate [respondent's] already troubled state of mind.'" 106 S.Ct. at 2630–31 (citation omitted). However, after faulting the court of appeals for revising some of the state court's findings and ignoring others, the Supreme Court rejected the court of appeals' conclusion that the police deliberately elicited the incriminating evidence. It is not absolutely clear from the language of *Kuhlmann* itself whether the Supreme Court meant that the ultimate conclusion—i.e., deliberate elicitation—was also a pure fact, or whether the ultimate conclusion, though a mixed question of fact and law, was rejected because of the court of appeals' disregard of the underlying subsidiary facts. I conclude that the Supreme Court must have meant the latter, because only the latter is consistent with the Supreme Court's treatment of the issue in *Henry*. In *Henry*, the district court addressed the issue as the initial fact finder and concluded that there had been no violation of Henry's Sixth Amendment right to counsel. The court of appeals for the Fourth Circuit reversed, concluding that there was sufficient "interrogation" by the informant. *Henry v. United States*, 590 F.2d 544, 547 (4th Cir.1978). The Supreme Court affirmed, holding that the informant "deliberately elicited" the incriminating evidence. Had the conclusion been a question of pure fact, the court of appeals and the Supreme Court would have remanded the case to the district court as fact finder.[17]

My conclusion that the ultimate determination of "deliberate elicitation" is a mixed question of fact and law also finds support in *Miller v. Fenton*, 474 U.S. 104, 115–17, 106 S.Ct. 445, 453, 88 L.Ed.2d 405 (1985). There the Supreme Court held that the "voluntariness" of a confession is a question of law subject to plenary review in federal habeas corpus proceedings. The ultimate issue of whether the circumstances of a *Henry* claim rise to the level of the functional equivalent of interrogation by

the government, like the issue in *Miller v. Fenton*, turns on "whether the techniques for extracting the statements" are compatible with the Constitution. 474 U.S. at 116, 106 S.Ct. at 453. Also as in *Miller v. Fenton*, the ultimate issue here does not turn on assessments of credibility and demeanor; the critical events occur in secret; and there is the same understandable reluctance to exclude otherwise reliable evidence. 474 U.S. at 117–18, 106 S.Ct. at 453–54. *See also DeAngelo v. Wainwright*, 781 F.2d 1516 (11th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 444, 93 L.Ed.2d 392 (1986).

The conclusion that Chavers "deliberately elicited" the incriminatory statements from Lightbourne is, in my judgment, mandated by *United States v. Henry*. The evidence in this case is far stronger than that which formed the basis of the Supreme Court's decision in *Henry*. There, the Supreme Court concluded on far weaker evidence that the informant, Nichols, engaged in affirmative conversation which resulted in Henry's incriminating statements. Moreover, in *Henry*, the Federal Bureau of Investigation official had expressly instructed the informant, Nichols, not to question Henry or initiate conversations with him. The Supreme Court nevertheless held that "[e]ven if the agent's statement that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result." *Henry*, 447 U.S. at 271, 100 S.Ct. at 2187. In the instant case, LaTorre did not caution Chavers against questioning Lightbourne or initiating conversations with him. Furthermore, it is obvious from the first taped statement which LaTorre took from Chavers that LaTorre was aware early on that Chavers was actively eliciting information from Lightbourne.

For the foregoing reasons, I conclude that Lightbourne has satisfied both the agency prong and the "deliberately elicit" prong of the *Henry* claim. In my judg-

---

17. This is especially true since *Henry* was a close case. *Henry*, 447 U.S. at 277, 100 S.Ct. at 2190 (Powell, J., concurring).

ment, Lightbourne has established that his Sixth Amendment right to counsel was violated under *Henry*.

However, Lightbourne's claim that the court erred in not suppressing his incriminating statements must be subjected to harmless error analysis. With respect to the guilt issue, I would find that the error is harmless beyond a reasonable doubt. Evidence of Lightbourne's guilt was overwhelming, though mostly circumstantial, even without his confession to Chavers. Indeed, Lightbourne had confessed to another jailhouse informant who later testified against him. However, the error is not harmless with regard to sentencing. Chavers' testimony contained the only direct evidence of oral sexual assault on the victim as well as the only graphic descriptions of the sexual attack and comments by the defendant about the victim's anatomy. Since this evidence would support the existence of an aggravating circumstance, and since it was likely to have been influential with the jury on the sentencing issue, I cannot conclude that the testimony was harmless with regard to sentencing. Thus I would reverse the judgment of the district court and remand with instructions that the writ of habeas corpus be issued unless the state affords Lightbourne a new sentencing hearing.

I respectfully dissent.

